222 N.J. Super. 363 (1988)
536 A.2d 1309
WALKER ROGGE, INC., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
CHELSEA TITLE & GUARANTY COMPANY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT, AND ARTHUR W. HOOD AND RONALD J. PRICE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 1987.
Decided February 1, 1988.
*365 Before Judges SHEBELL, GAYNOR and ARNOLD M. STEIN.
Richard A. Grossman argued the cause for appellant Chelsea Title & Guaranty Company (Grossman & Kruttschnitt, attorneys; Richard A. Grossman, of counsel and Thomas J. Heavey, on the brief).
Salvatore Perillo argued the cause for respondent Walker Rogge, Inc. (Perillo & Rosenberger, attorneys; Salvatore Perillo, on the brief).
Edwin A. Paone argued the cause for respondent Ronald J. Price (Mairone, Biel, Zlotnick, Feinberg & Griffith, attorneys; James Hopkins, on the brief).
John R. Weigel filed an amicus curiae brief on behalf of New Jersey Land Title Association (Joseph M. Clayton, Jr., on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
*366 Defendant Chelsea Title & Guaranty Company (Chelsea) appeals from a judgment awarding plaintiff damages under a title insurance contract. Plaintiff Walker Rogge, Inc. cross-appeals from dismissal of its negligence claim against Chelsea and the defendants Ronald J. Price and Arthur W. Hood, surveyors. Plaintiff also appeals the denial of interest from the time of closing and attorney's fees. The New Jersey Land Title Association, on leave, filed a brief as amicus curiae.
On December 12, 1979, Walker Rogge, Inc. contracted to purchase real property owned by Alexander and Constance Kosa. The total price was to be determined on a per acre basis. The contract indicated the quantity of land to be "19 acres more or less," but provided that a price adjustment would be made at settlement "for deviations from the amount of 19 acres, as shown by Price's Survey...." The contract made time of the essence, and the closing of title took place on December 31, 1979.
On or about December 13, 1979, plaintiff's president, John Rogge, a man experienced in real estate transactions, contacted Price Walker Associates regarding an updated survey. A 1975 survey of the subject property had been done by Price Walker. Defendant Arthur Hood, a Price Walker employee, carried out the updating of the earlier survey for which Rogge was never billed. On that same day, Rogge also called defendant Chelsea. It was disputed at trial as to what Rogge actually requested; however, the trial judge concluded that Rogge ordered a title insurance policy, not a title search.
Chelsea issued a title commitment which set a metes and bounds description identical to that of the 1975 Price survey, but did not specify an acreage amount. Chelsea's agent was unable to say how a description identical to that in the Price Walker survey came to be used.
On December 31, the date of closing, Rogge was still not in possession of the updated survey. He therefore called Price *367 and received an oral confirmation that the 1979 updated survey was the same as the 1975 survey. On that basis, plaintiff, who was not represented by an attorney, carried out the agreement based on the sale of 18 acres of land at $16,000 per acre. Kosas' attorney did not use the description in the deed into Kosas when preparing the deed from Kosas to Rogge, but used the 1975 Price Walker survey description instead. The deed into Kosas contained a different metes and bounds description and stated the total acreage as 12.48, rather than the approximately 18 acres contained in the 1975 survey.
Chelsea issued a policy of title insurance, effective January 10, 1980, insuring "against loss or damage, not exceeding the stated amount of insurance, costs, attorneys' fees and expenses which the company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:
1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;
2. Any defect in or lien or encumbrance on such title;
3. Lack of a right of access to and from the land; or
4. Unmarketability of such title.
The policy also contained exceptions, one of which stated:
This policy does not insure against loss or damage by reason of the following:
3. Encroachments, overlaps, boundary line disputes and other matters which could be disclosed by an accurate survey and inspection of the premises.
This exception was not removed from the policy at closing as testimony indicated would usually be the case when the title company is presented with a current survey. See 13A N.J. Practice (Lieberman, Abstracts and Titles) (3 ed. 1966), § 1701 at 194.
In 1985, Rogge sought to purchase lots adjacent to the subject property. Desiring to subdivide he hired Dennis Duffy to do a survey of the new property along with the land he had acquired from the Kosas. The Kosa-Rogge lots were found difficult to survey because of the absence of any physical monuments which would establish the rear boundary line, known as the "Grant line" or "Reed Plantation line." Duffy worked over a period of three months with old deeds and *368 surveys containing various distance descriptions attempting to locate the Grant line. Duffy's survey revealed that plaintiff owned only 12.43 acres, not 18 acres as stated in the Price Walker survey.
Duffy testified as to the procedure he and his employees utilized to set the boundaries and Grant line. He opined that the Price Walker inaccuracy occurred because the surveyor had included a point which was without basis in the older deeds and surveys.
Chelsea presented testimony from a surveying expert who did not undertake any field work, but who had studied the work done by Duffy and other surveyors. The expert testified that he was unable to conclude where the Grant line was located due to discrepancies in the ancient deeds and surveys. Duffy testified that if Chelsea's expert's calculations were carried out, plaintiff would have a total of 15.3 acres. Duffy also testified that earlier surveys had estimated the property at approximately 17 acres, based strictly on monument location and descriptions which did not include distances. The first deed which contained distances along with the monuments was that into Kosa from Aiello which set the acreage at approximately 12.4 acres.
Plaintiff's complaint against Chelsea demands recovery under the theories of negligence and contract and named Ronald J. Price, individually, and Arthur W. Hood, the Price Walker employee who prepared the 1979 updated survey, alleging negligence in the preparation of the inaccurate surveys. Plaintiff also made claim against the Kosas for breach of warranty deed; however, the Kosas could not be served with process, and therefore, at the time of trial, plaintiff took a voluntary dismissal as to them.
The trial court accepted Duffy's survey as the "most accurate," but at the end of plaintiff's case dismissed the negligence complaint against the defendant-surveyors because of the absence *369 of expert testimony to establish a standard of care which had not been met by the surveyors.
The trial judge in a letter opinion dated October 20, 1986, determined that the "loss" of acreage was within the coverage of Chelsea's policy. Recovery was permitted under three of the four enumerated guarantees, namely, (1) title to the estate or interest described in Schedule A being vested otherwise than as stated therein; (2) any defect in or lien or encumbrance on such title, and (4) unmarketability of such title.
The court found that the survey exception in the policy was inapplicable because in the absence of a third party adverse claim, there were no "encroachments, overlaps, or boundary line disputes," and that "other matters" was "so vague as to be meaningless."
The court dismissed the negligence claim against Chelsea, on its finding that Rogge had not ordered a title search, but only a title policy. The judge held that any search Chelsea undertook was for its own benefit in deciding whether to issue the policy.
The judge awarded plaintiff $88,000, based upon a calculation of 5.5 acres (the difference in acreage between what plaintiff paid for and received) X $16,000 (the amount paid per acre). Costs and prejudgment interest commencing as of the date of the filing of the complaint were awarded. Plaintiff's request for attorneys' fees was denied.
A title insurance policy is
a contract of indemnity under which the insurer for a valuable consideration agrees to indemnify the insured in a specific amount against loss through defects of title to, or liens or encumbrances upon realty in which the insured has an interest. [Sandler v. N.J. Realty Title Ins. Co., 36 N.J. 471, 478-79 (1962)].
Title insurance policies are subject to the same rules of construction as other insurance policies. Ibid. Thus, the insurer's liability is governed by the reasonable expectation of the average lay purchaser of insurance. MacBean v. St. Paul Title Insurance Corporation, 169 N.J. Super. 502, 507 (App.Div. 1979). This "reasonable expectation" principle has been specifically *370 applied to title insurance companies and interpreted to mean that the policy language must be "liberally construed in favor of the insured and strictly construed against the insurer." Sandler, 36 N.J. at 479. See MacBean, 169 N.J. Super. at 508; Keown v. West Jersey Title and Guaranty Co., 161 N.J. Super. 19, 27 (App.Div.), certif. den. 78 N.J. 405 (1978).
Under its title commitment of December 5, 1979, Chelsea proposed to insure title to "the estate or interest in the land described or referred to in this commitment...." The commitment described the land as follows:
SCHEDULE "A" (CONTINUED)
PREMISES
ALL that certain tract or parcel of land and premises, hereinafter particularly described, situate, lying and being in the Township of Galloway, in the County of Atlantic and State of New Jersey, bounded and described as follows:
BEGINNING at a stake in the Northwesterly line of Shore Road being corner to lands now or formerly of Mary E. Fries; and extending thence
(1) Along the same, North 43 degrees 51 minutes, 00 seconds West, 2643.48 feet to a point in line of lands now or formerly of James Grant; thence
(2) Along the same North 32 degrees 41 minutes 22 seconds East, 349.80 feet to a corner which is known as the Northwesterly corner of William Reed's Plantation in the original Deed to the herein conveyed premises from George W. Matthews and Mary Matthews, his wife, to Thomas Hartley dated June 21, 1883 and recorded in Deed Book 93, page 422 which corner is another corner of lands now or formerly of James Grant; thence
(3) Along the same, South 42 degrees 03 minutes 00 seconds East, 2740.34 feet to the Northwesterly line of Shore Road; thence
(4) Along the same, South 49 degrees 19 minutes 15 seconds West, 254.51 feet to the place of BEGINNING.
BEING KNOWN AS 1083 New York Road, Oceanville, (Galloway Township), New Jersey and further known as Lots 35 and 36 in Block 1167 on the Official Tax Map of the Township of Galloway.
In the policy of title insurance effective January 10, 1980, the "[d]escription of the land in which the Insured has the estate or interest covered by this Policy" is described as "SITUATE in the Township of Galloway, County of Atlantic and State of New Jersey. More particularly described in the Deed to the Insured above mentioned." "The deed or other means by which the *371 estate or interest covered by this Policy is vested in the Insured is described as follows: DEED: Alexander Kosa, Jr. and Constance P. Kosa, his wife, to the Insured, dated December 31, 1979 and recorded in the Atlantic County Clerk's Office January 10, 1980 in Book 3435 of Deeds, page 41." The deed from Kosas to the insured, Walker Rogge Company, contains the exact metes and bounds description that is contained in the title commitment, as set out above.
Neither plaintiff's deed nor the title policy states an actual acreage total on its face. However, calculations based upon the descriptions in those documents result in an acreage total of approximately 18 acres, just as the Price Walker surveys from which these numbers originated show a total of approximately 18 acres.
We are convinced that the trial court properly held Chelsea to what it guaranteed in the policy. The policy insures "against loss or damage ... sustained or incurred by reason of
1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;
2. Any defect in or lien or encumbrance on such title;
3. Lack of a right of access to and from the land; or
4. Unmarketability of such title."
Chelsea thereby guaranteed that plaintiff would have good and marketable title to the property described in the policy it issued. Plaintiff demonstrated it did not become vested of title to the entire parcel described; therefore, plaintiff's title was defective and unmarketable as to that portion of the parcel to which it did not obtain title.
Chelsea apparently chose to rely on a description based upon the Price Walker survey despite the fact that its own files contained a number of deeds and surveys which clearly showed the property to contain about 12.5 acres. These documents, including the deed from Aiello to Kosa, contained descriptions which varied greatly from the description given in the Price Walker survey. Also within Chelsea's files was a plotting of a *372 survey dated July 27, 1971, prepared by one George Schilling, showing a total acreage of 12.486.
A cursory review of the documents available to Chelsea should have alerted it to the fact that a question existed as to the accuracy of the Price Walker survey. Chelsea nonetheless insured that plaintiff received good and marketable title to the land described in the commitment, deed and title policy. Plaintiff did not receive the land as guaranteed, and therefore, Chelsea is liable under the policy for the difference in price between what plaintiff actually received and what Chelsea guaranteed, unless a policy exception is applicable.
Chelsea maintains that the following survey exception in the policy is applicable.
This policy does not insure against loss or damage by reason of the following:
3. Encroachments, overlaps, boundary line disputes and other matters which could be disclosed by an accurate survey and inspection of the premises. [Emphasis supplied].
As previously stated, the language an insurer employs in its policies must be strictly construed against it and liberally construed in favor of the insured. Sanders, 36 N.J. at 479. We conclude that the survey exception employed does not exclude coverage in this case.
Chelsea provided that it would be protected from payment if an accurate survey and inspection of the premises were to reveal encroachments, overlaps, boundary line disputes or other matters. It is clear from the proofs that the usual survey and inspection of the premises would not reveal any encroachments, overlaps, boundary line disputes or "other matters" within the actual dimensions of the lands described in plaintiff's deed. Plaintiff was given a deed with an improper description of the property being conveyed. This inaccuracy could not be recognized by an inspection of the premises and indeed the improper description came from a survey recognized by Chelsea. This description was inserted in Chelsea's title commitment and policy. We are satisfied that "an accurate survey" within the meaning of the exception is one based on the description of the *373 property as stated in the deed and title policy. See Waterview Assoc., Inc. v. Lawyers Title Ins. Corp., 30 Mich. App. 687, 186 N.W.2d 803, 810 (1971). There would have been no discrepancy between a survey and the policy description. Therefore, the exception would not have benefited Chelsea. Id. at 701-707, 186 N.W.2d at 810-12.
Further, Chelsea's use of the word "and" in its exception must be construed to mean that only those defects which could be disclosed by an accurate survey and inspection of the premises are excepted. The evidence fails to show that an inspection of the premises could have disclosed the discrepancies complained of. Moreover, it appears that the defendant-surveyors were unable from their on-site inspections to recognize that a problem existed. If Chelsea, as drafter of the policy, wanted to protect itself against an inaccurate survey or description of the property, we believe it was required to have incorporated clear and simple language into the policy to put plaintiff on notice that it was not insuring the description of the land as contained in the policy.
The trial judge ruled out negligence as a basis for Chelsea's liability. He found that Rogge engaged Chelsea to undertake the issuance of a title policy only and not for the separate function of preparing a title report. He therefore concluded Chelsea owed no duty, aside from the insurance contract, to plaintiff. Purely factual findings should only be disturbed on appeal if not supported by adequate, substantial, and credible evidence. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974); Mocco v. Picone, 203 N.J. Super. 443, 451 (App.Div. 1985).
The finding of the trial judge, however, must be viewed as involving a mixed question of law and fact. Title insurance companies are governed by statute, "The Title Insurance Act of 1974." N.J.S.A. 17:46B-1 to 17:46B-62. As used in the act,
"Title insurance" means insuring, guaranteeing or indemnifying owners of real property or others interested therein against loss or damage suffered by *374 reason of liens, encumbrances upon, defects in or the unmarketability of the title to said property, guaranteeing, warranting, or otherwise insuring by a title insurance company the correctness of searches relating to the title to real property, or doing any business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of this act. [N.J.S.A. 17:46B-1a; emphasis supplied].
Further, "The `business of title insurance' shall be deemed to be... the transacting or proposing to transact, any phase of the title insurance, including abstracting, examination of title, ..." N.J.S.A. 17:46B-1b. More importantly, the act further provides, in relevant part,
No policy or contract of title insurance shall be written unless and until the title insurance company has caused to be conducted a reasonable examination of the title and has caused to be made a determination of insurability of title in accordance with sound underwriting practices for title insurance companies. [N.J.S.A. 17:46B-9].
Chelsea was thus bound by statute to undertake a title search even in the absence of a request by plaintiff. We see no reason why the insured should not benefit from this statutorily imposed duty.
On the facts of this case, we find no necessity for expert testimony to set the requisite standard of care imposed upon the title company. The examination of title must be "reasonable" and the determination of insurability must be "in accordance with sound underwriting practices for title insurance companies." N.J.S.A. 17:46B-9. "The test of need of expert testimony is whether the matter to be dealt with is so esoteric" that a valid judgment could not be formed by a fact finder of common judgment and experience. Butler v. Acme Markets, Inc., 89 N.J. 270, 283 (1982).
The extent of information that Chelsea overlooked in review of its files on this property, whether for its own benefit or the plaintiff's, makes it apparent that the requisite standard of care was not met. Chelsea failed to explain the source of its description which corresponded to the Price Walker survey and failed to alert plaintiff that Chelsea's description of the property in the title binder was in conflict with earlier surveys and descriptions.
*375 Plaintiff also alleges that the trial judge improperly granted the motions of defendant surveyors Hood and Price for involuntary dismissal at the close of plaintiff's case. R. 4:37-2(b), "Involuntary Dismissal; Effect Thereof," states in full:
After the plaintiff has completed the presentation of his evidence on all matters other than the matter of damages (if that is an issue), he shall so announce to the court, and thereupon the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action or any claim against him on the ground that upon the facts and upon the law the plaintiff has shown no right to relief. Whether the action is tried with or without a jury, such motion shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor.
"The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion." Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969).
In granting the motions, the trial judge concluded that plaintiff had not sustained its burden of establishing a prima facie case of negligence against the defendant-surveyors.
[I]t's my conclusion that in order for defendant Hood to be held responsible under the theory of negligence which is what was pled against him, there must be expert testimony that ... first of all that there was a standard of ... conduct for him, for a surveyor. I heard nothing about a conduct of behavior for a surveyor and secondly that there was a deviation from the standard and I heard nothing about that either. All I heard was and I'll conclude that .. . the Price Walker Hood survey was wrong, but I don't think in my view that that's sufficient for plaintiff to carry its burden of proof in an action such as this where the, ... area in question to be surveyed is open to so much discrepancy and, ... difficulty as it obviously was from the testimony of Mr. Duffy, the plaintiff's expert. For these reasons, the Motion of Hood to dismiss the case as to him at this juncture is granted. As to Price, I think it obviously falls logically that if, if Hood is out, then Price is out too....
Plaintiff's expert did not give an opinion as to whether the surveyors were negligent. As noted earlier, "the test of need of expert testimony is whether the matter to be dealt with is so esoteric" that a valid judgment could not be formed by a fact finder of common judgment and experience. Butler, 89 N.J. at 283.
*376 The trial judge was able to determine, based upon expert testimony, that the Duffy survey was the most accurate, thereby implicating the finding that the Price Walker, Hood survey was inaccurate. He was not willing, however, to take the further step of equating this inaccuracy with negligence, in the absence of expert testimony. Based upon the evidence showing that the surveying of this particular plot was extremely difficult, we are unable to say that the judge was incorrect in finding plaintiff's negligence claim required expert testimony to support it. The trial judge stated: "If this court learned nothing else during the trial of this matter, it learned that surveying land can be a rather imprecise art in some cases." This observation supports his determination that a valid judgment on the issue of defendants' negligence could not be formed by the application of common judgment and experience. For the same valid reason, the trial judge was unable to conclude whether the occurrence of an inaccurate survey "ordinarily bespeaks negligence," thereby precluding the application of the doctrine of res ipsa loquitur. See Buckelew v. Grossbard, 87 N.J. 512, 525 (1981), quoting Bornstein v. Metropolitan Bottling Co., 26 N.J. 263, 269 (1958).
Plaintiff requested counsel fees pursuant to R. 4:42-9(a)(6), which states: "No fee for legal services shall be allowed in the taxed costs or otherwise, except ... [i]n an action upon a liability or indemnity policy of insurance, in favor of a successful claimant." This request was denied on the basis of our decisions in Enright v. Lubow, 202 N.J. Super. 58 (App.Div. 1985), certif. den. 104 N.J. 376 (1986), on reconsideration 215 N.J. Super. 306 (App.Div.), certif. den. 108 N.J. 193 (1987), and Kistler v. N.J. Mfts. Ins. Co., 172 N.J. Super. 324 (App.Div. 1980).
The trial judge correctly denied plaintiff's request. R. 4:42-9(a)(6) is "inapplicable to direct actions brought by the insured against the carrier to enforce direct coverage." Enright, 215 N.J. Super. at 311-12. The Supreme Court, recognizing the divergence of opinion on this subject, appointed a Committee to *377 evaluate the problem. The Committee recommended that R. 4:42-9(a)(6) not be extended to cover the very situation now before this court. Id. at 312-13. The Supreme Court, based in part upon the Committee's recommendation, "has not amended the Rule to explicitly permit counsel fees in first party claims on liability and indemnity policies." Id. at 313.
Even assuming that R. 4:42-9(a)(6) did not bar plaintiff from receiving counsel fees, there is no evidence presented by plaintiff that the trial judge abused his discretion in denying plaintiff's request for these fees. The awarding of counsel fees is not mandatory in every action on an indemnity policy. Ibid.; Kistler, 172 N.J. Super. at 329. "The trial judge has broad discretion as to when, where and under what circumstances counsel fees may be proper." Enright, 215 N.J. Super. at 313. See Kistler, 172 N.J. Super. at 329.
Plaintiff also contests the trial court's awarding of prejudgment interest as of the date the complaint was filed rather than from the date of closing. The awarding of prejudgment interest on contract claims is to be determined in accordance with equitable principles. Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 131 (1976); A.J. Tenwood A. v. Orange Sr. Cit. Housing, 200 N.J. Super. 515, 525 (App.Div.), certif. den. 101 N.J. 325 (1985). "[T]his court will defer to the trial court's exercise of discretion involving prejudgment interest unless it represents a manifest denial of justice." A.J. Tenwood A., 200 N.J. Super. at 525. Plaintiff has not shown that the trial court's ruling amounts to a "manifest denial of justice."
Plaintiff also maintains that the trial court incorrectly computed damages. Plaintiff argues that the difference in acreage between the Duffy survey (12.434 acres) and the Price-Hood survey (18.33 acres) was 5.896 acres. Thus, plaintiff's damages should be $94,336.00, not $88,000 which represents 18 acres contracted for and the approximately 12.5 acres (as per the Duffy survey) which plaintiff received.
It appears that there was a 1974 Price Walker survey, a 1975 Price Walker survey, and the 1979 update. Plaintiff, in its *378 brief, alleges that the 1974 survey was used to make the adjustments in the sale contract, and that that survey showed total acreage to be 18.33. Rogge testified that the 1975 survey was used to make the adjustments to the sales contract. Neither survey is included in the record. The record on appeal contains the 1979 updated survey, which shows the total acreage as 18.01. In any event, calculations should be based upon the description contained in the title policy as that is the land which plaintiff was guaranteed.
Chelsea maintains that plaintiff suffered no actual damages and that any proof of loss would necessarily involve an adjudication of the rights of neighboring land owners. This contention is clearly without merit. R. 2:11-3(e)(1)(E). Plaintiff has suffered a loss in that it was guaranteed a good and marketable title to land described by Chelsea which it did not receive.
We affirm the judgment of liability against defendant Chelsea, as well as the entry of involuntary dismissals as to defendants Hood and Price and the denial of plaintiff's claim for attorney's fees and prejudgment interest to the time of closing. We remand for further proceedings to clarify the accuracy of the dollar amount of the award for plaintiff's loss.