WALKER ROGGE, INC., A NEW JERSEY CORPORATION, PLAIN-
TIFF–RESPONDENT AND CROSS–APPELLANT, v. CHELSEA
TITLE & GUARANTY COMPANY, DEFENDANT–APPELLANT
AND CROSS–RESPONDENT, AND ARTHUR W. HOOD AND
RONALD J. PRICE, DEFENDANTS–CROSS–RESPONDENTS.

Argued January 4, 1989—Decided August 9, 1989.

518

*Richard A. Grossman* argued the cause for appellant and cross-respondent (*Grossman & Kruttschnitt,* attorneys; *Mr. Grossman* and *Thomas J. Heavey,* on the briefs).

*Salvatore Perillo* argued the cause for respondent and cross-appellant (*Perillo & Rosenberger,* attorneys).

*Edwin A. Paone* argued the cause for cross-respondent Ronald J. Price (*Mairone, Biel, Zlotnick, Feinberg & Griffith,* attorneys).

*Clement F. Lisitski* submitted a letter in lieu of a brief on behalf of cross-respondent Arthur W. Hood.

*Joseph M. Clayton, Jr.,* submitted a brief on behalf of *amicus curiae* New Jersey Land Title Association (*John R. Weigel,* attorney).

The opinion of the Court was delivered by

POLLOCK, J.

This case focuses on the respective liabilities of two land surveyors and a title insurance company for a deficiency in acreage when the insured purchaser acquires all the land described in the contract of purchase, but the land so described contains less acreage than the insured contemplated.

The matter proceeded in the Law Division as a non-jury trial. Because of the absence of expert testimony establishing the relevant standard of care, the court dismissed at the close of plaintiff's case the negligence claim against the surveyors, Arthur W. Hood and Ronald J. Price. After the entire trial, the court ruled that the title insurance company, Chelsea Title & Guaranty Company (Chelsea), was liable under its title policy, but not in negligence. The Appellate Division affirmed the judgment, but remanded the matter to the Law Division for recomputation of damages. 222 *N.J.Super.* 363 (1988). In affirming, the Appellate Division found that Chelsea was liable in both negligence and in contract. We granted Chelsea's petition for certification and the cross-petition of plaintiff, Walker Rogge, Inc. (Walker Rogge). We reverse the judgment against Chelsea, modify and remand the judgment in favor of Price and Hood, and remand the entire matter to the Law Division.

–I–

Our analysis of the facts involves consideration of the nature of the relationship between a real estate purchaser and a title insurance company, the special characteristics of real estate transactions, and the details of the subject transaction. The central figure in this matter is John Rogge (Rogge), president, director, and the majority shareholder of Walker Rogge. A licensed real estate broker since 1946, Rogge has been in the business of buying, selling, and appraising real estate for over forty years. He has participated in over 4,000 transactions with Chelsea, with which he had a long-standing business relationship. The trial court accurately described him as "a sophisticated and successful realtor."

Chelsea is a corporation engaged in the business of insuring titles, with its principal place of business in Northfield, New Jersey. Toward that end, it examines titles and conducts real estate closings. Price was formerly in business with John Walker as Price Walker Associates (Price Walker), and continued in business as Price Engineering Company (Price Engineering). Hood was one of the employees of Price Engineering. Price and Rogge were personal and business friends, and Rogge was indirectly responsible for Price's appointment as engineer for the town of Brigantine, where Rogge had served as a committeeman and mayor.

The property in question is a tract of land in Galloway Township, in Atlantic County, formerly owned by Alexander and Constance Kosa (jointly described as Kosa), who had acquired the property from one Aiello. Rogge initially became interested in the property while acting as a broker, but subsequently negotiated a purchase for Walker Rogge. Before Rogge signed the contract of sale on December 12, 1979, Kosa showed him a survey dated February 27, 1975, by Price Walker. Together Kosa and Rogge walked the boundary lines of the property. Rogge, however, did not retain a lawyer to represent him or his corporation in drawing the purchase contract, ar-

ranging for the necessary searches or survey, or at the closing. Instead, he relied on his own experience and his long-standing relationships with Chelsea and Price.

The 1975 Price Walker survey indicated that the tract consisted of two lots with a combined acreage of 18.33 acres: Lot 35 contained 18.01 acres and Lot 36 contained .32 acres. The contract indicated the quantity of land to be "19 acres more or less." It called for a price of $363,000, which was determined "on the basis of $16,000.00 per acre," and was to be adjusted "for deviations from the amount of 19 acres, as shown by Price's Survey at settlement, bounded and described as follows: Being Lot 35 and 36, Block 1167." Because Lot 36 included a house, the actual sale price was greater than the product of the number of acres times the price per acre.

The contract stated that the $363,000 purchase price would be paid by $80,000 in cash, with Kosa taking back a four-year purchase money mortgage for $283,000. Signed on December 12, 1979, the contract called for a closing two and one-half weeks later on December 31, with time of the essence.

On the day after signing the contract, December 13, Rogge ordered a title insurance policy from Chelsea and asked Price to update the 1975 survey. Although Rogge testified at trial that he had ordered from Chelsea a title search, as well as a title policy, the trial court did not believe that testimony. In rejecting Rogge's testimony that he had requested a title search, the court stated "that testimony just did not have the ring of truth to it." Consequently, the court concluded "that plaintiff [Rogge] simply requested that the title work be handled by Chelsea."

Chelsea issued a title commitment that, curiously, is dated December 5, 1979, one week before the date of the contract. In the commitment or binder, the property is described as follows:

ALL that certain tract or parcel of land and premises, hereinafter particularly described, situate, lying and being in the Township of Galloway, in the County of Atlantic and State of New Jersey, bounded and described as follows:

BEGINNING at a stake in the Northwesterly line of Shore Road being corner to lands now or formerly of Mary E. Fries; and extending thence

(1) Along the same, North 43 degrees 51 minutes, 00 seconds West, 2643.48 feet to a point in line of lands now or formerly of James Grant; thence

(2) Along the same North 32 degrees 41 minutes 22 seconds East, 349.80 feet to a corner which is known as the Northwesterly corner of William Reed's Plantation in the original Deed to the herein conveyed premises from George W. Matthews and Mary Matthews, his wife, to Thomas Hartley dated June 21, 1883 and recorded in Deed Book 93, page 422 which corner is another corner of lands now or formerly of James Grant; thence

(3) Along the same, South 42 degrees 03 minutes 00 seconds East, 2740.34 feet to the Northwesterly line of Shore Road; thence

(4) Along the same, South 49 degrees 19 minutes 15 seconds West, 254.51 feet to the place of BEGINNING.

BEING KNOWN AS 1083 New York Road, Oceanville, (Galloway Township), New Jersey and further known as Lots 35 and 36 in Block 1167 on the Official Tax Map of the Township of Galloway.

The preceding description differs from that in the deed from Aiello to Kosa (the Aiello deed), in which the property is described as follows:

BEGINNING at a stake in the Northwesterly line of Shore Road being corner to lands now or formerly of Mary E. Fries; and extending thence

(1) Along the same North 43 degrees 51 minutes West 1810.30 feet to a point in line of lands now or formerly of James Grant; thence

(2) Along the same North 19 degrees 38 minutes East 348.99 feet to a corner which is known as the Northwesterly corner of William Reed's Plantation in the original Deed to the herein conveyed premises from George W. Matthews and Mary Matthews his wife, to Thomas Hartley dated June 21, 1883 and recorded in Deed Book 93 page 422 which corner is another corner of lands now or formerly of James Grant; thence

(3) Along the same South 42 degrees 30 minutes East 1965.18 feet to the Northwesterly line of Shore Road; thence

(4) Along the same South 45 degrees 50 minutes West 265.98 feet to the place of BEGINNING.

CONTAINING 12.486 acres.

BEING commonly known as 1083 New York Road, Oceanville, (Galloway Township) New Jersey.

Although it does not so indicate, the Aiello deed is substantially based on a 1971 survey done by Wood & Schilling (Schilling) for Kosa when they purchased the property. As is revealed by a comparison of the above-quoted descriptions, the description in the title commitment and that in the Aiello deed

call for the same monuments, but the distances and bearings of the respective courses differ. The property lines, particularly those of the first and third courses, as described in the title commitment are considerably longer than the comparable courses in the Aiello deed. As a result, the title policy, which incorporates by reference the description contained in the deed from Kosa to Walker Rogge, describes a tract with more acreage than is described in the Aiello deed. Unlike that deed, which indicated that the tract contained 12.486 acres, neither the title commitment nor the Kosa deed indicates the acreage of the tract. Furthermore, the commitment does not incorporate or refer to the description in the Aiello deed.

Perhaps because of the passage of time, memories of the participants have grown dim and their testimony uncertain. No one knows why a description based on the Price Walker survey, rather than one based on the description in the Aiello deed, was inserted in the commitment and in the Kosa deed.

Although Chelsea had six back files in its title plant and had issued two prior title policies on the subject property, none of the descriptions in the back files was the same as the description in the Kosa deed or the title commitment. Two of the Chelsea files, one pertaining to the Aiello deed and the other to a mortgage later given by Kosa, contained copies of the 1971 Schilling survey, which, like the Aiello deed, described the property as containing 12.486 acres.

The title binder or commitment expressly provided:

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed to the satisfaction of the Company:

 * * * * * * * *

4. Encroachments, overlaps, boundary line disputes and other matters which could be disclosed by an accurate survey and inspection of the premises.

Rogge apparently assumed the responsibility for obtaining a survey and asked Price to update the 1975 survey. It further appears that Rogge did not receive an updated survey by December 31, so he called Price from Chelsea's office while the

closing was in progress. Price confirmed on the telephone that the updated survey showed no change from the 1975 survey. Relying on that oral confirmation and the recitation of acreage in the 1975 Price Walker survey, Rogge closed the deal.

After the closing, Chelsea issued a title policy, which states that

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF,

Chelsea Title and Guaranty Company, a New Jersey corporation herein called the Company, insures, as of Date of Policy shown in Schedule A [January 10, 1980], against loss of damage, not exceeding the amount of insurance stated in Schedule A [$363,000], and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured [Walker Rogge] by reason of:

1. Title in the estate or interest described in Schedule A being vested otherwise than as stated herein;

2. Any defect in or lien or encumbrance on such title;

3. Lack of a right of access to and from the land; or

4. Unmarketability of such title.

Repeating the identical exception in Schedule B of the title commitment, that schedule in the title policy states: "This policy does not insure against loss or damage by reason of the following: * * * 3. Encroachments, overlaps, boundary line disputes and other matters which could be disclosed by an accurate survey and inspection of the premises."

The description of the property in Schedule A, which was the same description contained in the title binder and in the Kosa deed, was based on the 1975 Price Walker survey. Like the binder and the Kosa deed, Schedule A did not indicate the acreage of the property.

Over the six years following the closing, Walker Rogge paid off the purchase money mortgage, but did not obtain a more recent survey. Then in 1985 Rogge sought to acquire lots adjacent to the property in question preparatory to subdividing the entire property. In connection with the subdivision, Rogge hired a new surveyor, Dennis Duffy, who concluded after extensive field work, research, and title searching that the

property in question contained not 18.33 acres, as was stated in the 1975 Price Walker survey, but 12.43 acres, a quantity much closer to the recital of 12.486 acres in the Aiello deed.

Considerable testimony was adduced before the trial court concerning the difficulties of surveying the property. As the Appellate Division observed,

[t]he Kosa–Rogge lots were found difficult to survey because of the absence of any physical monuments which would establish the rear boundary line, known as the 'Grant line' or 'Reed Plantation line.' * * * [Duffy] opined that the Price Walker inaccuracy occurred because the surveyor had included a point which was without basis in the older deeds and surveys. [222 *N.J.Super.* at 367–68.]

Conflicts between the testimony of the surveying experts led the trial court to observe in its opinion

that surveying land can be a rather imprecise art in some cases. Thus, absolute certainty is an elusive goal. But, since the accuracy of the Duffy survey as opposed to the metes and bounds description in plaintiff's deed is of central importance in this case, it is incumbent upon this court to determine the accuracy issue. Recognizing, then, that certainty is not possible, it is the conclusion of this court that it is more probable than not the Duffy survey is closer to reflecting accuracy.

On learning from Duffy that it had acquired only twelve acres, Walker Rogge instituted the present action. In its complaint, Walker Rogge alleged that the 5.5 acre shortage was an insurable loss under the policy and that Chelsea was liable in negligence in failing to disclose documents in its files revealing that the property contained fewer than eighteen acres. As against Hood, Walker Rogge alleged negligence in updating the 1975 Price Walker survey and in preparing a survey dated December 21, 1979. Price was negligent, so Walker Rogge asserted, in preparing the 1975 survey and in supervising Hood's preparation of the December 21, 1979 survey. Plaintiff did not assert any claim against Price Walker or Price Engineering.

In dismissing the complaint against Hood and Price, the court ruled that the mere fact that the Price Walker survey was inaccurate was insufficient to establish negligence by the surveyors. At the conclusion of the trial, the court determined that the policy covered the shortage in acreage. The court

found that title to the property was not vested as described in the policy, that the shortage constituted a defect in title, and that the title was unmarketable. Furthermore, the court found the survey exception "so vague as to be meaningless."

Although Chelsea had billed Walker Rogge $75 for a title examination, the court found that Rogge had ordered only a title policy, and not a title search. Damages were computed by deducting the 12.5 acres actually received, as determined by the Duffy survey, from the 18 acres for which Rogge had paid. By multiplying 5.5 acres times the $16,000 per-acre purchase price, the court calculated that damages were $88,000. Costs and prejudgment interest were awarded, but counsel fees were denied.

The Appellate Division affirmed the judgment, but remanded the matter for clarification of the damages. 222 *N.J.Super.* 363. It agreed with the trial court that the policy covered the deficiency in acreage. The court referred to provisions of the policy insuring " 'against loss or damage * * * sustained or incurred by the insured by reason of' " title to the property " 'being vested otherwise than as stated' " in Schedule A; defects in title; lack of access; and " '[u]nmarketability of such title.' " *Id.* at 367. Without any analysis or citation of any authority, the Appellate Division concluded:

> Chelsea thereby guaranteed that plaintiff would have good and marketable title to the property described in the policy it issued. Plaintiff demonstrated it did not become vested of title to the entire parcel described; therefore, plaintiff's title was defective and unmarketable as to that portion of the parcel to which it did not obtain title. [*Id.* at 371.]

From this the court concluded that Chelsea was "liable under the policy for the difference in price between what plaintiff actually received and what Chelsea guaranteed * * *." *Id.* at 372. The survey exception was found to be inapplicable for several reasons. First, it applied only to " 'other matters which could be disclosed by an accurate survey *and* inspection of the premises,' " and an inspection would not have disclosed the shortage. *Ibid.* Therefore, the court reasoned, the exception

did not apply. Another reason for not following the exception was that " 'an accurate survey' within the meaning of the exception is one based on the description of the property as stated in the deed and title policy. * * * There would have been no discrepancy between a survey and the policy description." *Id.* at 372–73. This led the court to conclude that "the exception would not have benefitted Chelsea." *Id.* at 373. Finally, the court found that the policy was unclear. Thus, it affirmed the finding of liability under the policy.

The Appellate Division then revisited the negligence issue and found a statutory basis for concluding that Chelsea failed to meet the requisite standard of care. Looking at the Title Insurance Act, *N.J.S.A.* 17:46B–1 to –62, the court noted that *N.J.S.A.* 17:46B–9 requires a " 'reasonable examination of the title * * * in accordance with sound underwriting practices for title insurance companies' " before a title company may issue a title policy. 222 *N.J.Super.* at 374. From this, the Appellate Division concluded "Chelsea was thus bound by statute to undertake a title search even in the absence of a request by plaintiff. We see no reason why the insured should not benefit from this statutorily imposed duty." *Ibid.* Chelsea's title search, "whether for its own benefit or the plaintiff's," created a standard of care that it (Chelsea) has breached. *Ibid.* This conclusion was based primarily on Chelsea's access to its own files, rather than on its search of the public records. Finally, the court affirmed the dismissal of the negligence claims against Hood and Price because of the failure to establish a standard of care for surveyors.

–II–

As we have previously stated, "[a] title insurance policy is a contract of indemnity under which the insurer for a valuable consideration agrees to indemnify the insured in a specified amount against loss through defects of title to, or liens or encumbrances upon realty in which the insured has an interest." *Sandler v. New Jersey Realty Title Ins. Co.*, 36 *N.J.*

471, 478–79 (1962). Like other policies of insurance, title policies are liberally construed against the insurer and in favor of the insured. *Id.* at 479. Notwithstanding that principle of construction, courts should not write for the insured a better policy of insurance than the one purchased. *Last v. West Am. Ins. Co.*, 139 *N.J.Super.* 456, 460 (App.Div.1976).

Real estate title insurance policies, like other aspects of the transfer of real estate, are unavoidably technical. That technicality counsels a prudent purchaser to consult qualified experts such as lawyers and surveyors. The reason is that the purchase of real estate, even something as commonplace as a single-family residence, is qualitatively different from the purchase of personal property such as furniture, automobiles, and securities. Lawyers, who are familiar with the technicalities and terminology of real estate law, are not only helpful but virtually essential for the protection of the rights of anyone purchasing real property. Every home buyer knows as much. Anyone who buys real estate without the aid of a surveyor runs the risk that he or she may not receive all the land for which he or she paid. In brief, title insurance is no substitute for a survey.

A fundamental principle in the interpretation of a real estate description is that calls to monuments will prevail over the stated distance in the course leading to that line. *Hofer v. Carino*, 4 *N.J.* 244, 250–52 (1950); 13 M. Lieberman, *New Jersey Practice* § 375 at 267 (3d ed. 1966) (Lieberman I); 11 *C.J.S.* Boundaries § 51 at 614 (1938). This principle is frequently described by the phrase that "calls prevail over distances." Natural boundaries and property lines, like iron stakes and stone pillars, are considered to be monuments. *Hofer, supra*, 4 *N.J.* at 251. Thus, the call for a proposed line will prevail over the stated distance to that line.

In the present case, the call in the first course of the deed to the line of "lands now or formerly of James Grant" prevails over the distance called for, 2643.48 feet, to that line. From its

beginning point, the first course runs to the Grant line. The same principle applies to the other courses. Each line extends to a monument, regardless of the asserted length of the line. Plaintiff's expert, Duffy, recognized that principle. He explained that "if you throw out the distance, [the Chelsea title policy] calls to the Grant line, the natural monument is correct. According to the deeds, there is not an overlap." Consequently, he described the present case as a "survey dispute," not a dispute about a boundary line or an overlap.

Plaintiff seeks to avoid the calls-over-distances rule by stating that the Grant line should not be considered a monument. The asserted reason is that the location of that line is indefinite. We disagree. That line is precisely where it should be, between the first and third points of the description. The basic problem is that the distance of the first course ending at a point in that line is less than plaintiff anticipated. Again we refer to plaintiff's expert, Duffy:

> No, again I differ with you on the way the property is described. The calls were the same, the distances were different. * * * If you review the Aiello to Cosa [sic] deed, the Cosa [sic] to Rogge deed, and even the deeds prior to Aiello, they all follow the same calls, or what we refer to as surveyors, natural monuments, such as the Grant line, the William Reed line to the northwesterly line of Route 9, along the northwesterly line of Route 9, they're all natural monuments * * *. Every deed states the same calls, same locations, the same monuments. The only difference is to our knowledge the first time it was ever measured in the Aiello to Cosa [sic] deed, or to determine the exact distance, is what changed [sic].

As Duffy explained, the calls were accurate. Indeed, they provided the basis for his survey, just as they did for Price.

No one disputes that plaintiff acquired all the property that Kosa owned. Because boundary lines of the property were shorter than he realized, plaintiff received less land than he thought he was buying. The difference is significant because plaintiff purchased the property on a per-acre basis. In short, it paid for land that it did not receive. The Chelsea title commitment and policy, like the Kosa deed, however, does not contain a recital of acreage. Although it may be possible to compute acreage on the basis of the description in those instru-

ments, the question remains whether Chelsea was obligated to make that computation.

■■■ In the absence of a recital of acreage, a title company does not insure the quantity of land. Title companies are in the business of guaranteeing title, not acreage. *See Contini v. Western Title Ins. Co.,* 40 *Cal.App.*3d 536, 542–43, 115 *Cal. Rptr.* 257, 260–61 (1974). To obtain such insurance, an insured should provide the title company with an acceptable survey that recites the quantity of land described or obtain from the company an express guaranty of the quantity of land insured in the policy.

Consistent with that premise, title insurance policies generally provide either that they are subject to such state of facts as an accurate survey would disclose or to the facts shown on an acceptable survey. Thus, one of the reasons that purchasers obtain surveys is to find out how much land they are buying. Another reason for obtaining a survey is to eliminate from the title policy the exception for such state of facts as an accurate survey would disclose.

For different reasons, the lower courts decided not to give effect to the survey exception in the subject policy. The trial court found the phrase "other matters which an accurate survey would disclose" was

> so vague as to be meaningless. A policy holder could not possibly be put on notice as to what would be excepted by operation of those words. Again, it must be remembered who prepared the policy. If Chelsea had intended to except erroneous surveys it could easily have done so by including clear language in its policy. * * * It must be further kept in mind that Chelsea started this problem in motion by using the legal description derived from the Price Walker survey, when that description had never been used before in any of the transactions in which Chelsea had participated. Thus, it seems rather incongruous for Chelsea to argue that it has no liability due to the survey exception when Chelsea itself initiated the use of the inaccurate metes and bounds description.

Pointing to "the examples enumerated in the 'survey exception' —encroachments, overlaps and boundary line disputes," the court noted that they "all deal with claims which an adjoining

landowner might have against the insured. If 'other matters' means 'other *similar* matters,' then the exception would not apply to the situation before the court since it does not involve an adverse claim by an abutting owner."

The Appellate Division relied on additional reasons for not recognizing the survey exception. It said that

[p]laintiff was given a deed with an improper description of the property being conveyed. This inaccuracy could not be recognized by an inspection of the premises and indeed the improper description came from a survey recognized by Chelsea. This description was inserted in Chelsea's title commitment and policy. We are satisfied that "an accurate survey" within the meaning of the exception is one based on the description of the property as stated in the deed and title policy. *See Waterview Assoc., Inc. v. Lawyers Title Ins. Corp.*, 30 *Mich.App.* 687, 186 *N.W.*2d 803, 810 (1971). There would have been no discrepancy between a survey and the policy description. Therefore, the exception would not have benefited Chelsea. *Id.* at 701–707, 186 *N.W.*2d at 810–12. [222 *N.J.Super.* at 372–73.]

Finally, the court ruled that for the exception to apply, the defect must be disclosed by both an accurate survey and a physical inspection of the property. Because an inspection would not have revealed the shortage, the court found the exception to be inapplicable. We disagree with the analyses of both courts.

At the outset, we find that the survey exception is neither vague nor unenforceable. The subject policy is in a form promulgated in 1970 by the American Land Title Association, which has been approved by the Commissioner of Insurance. Identical or similar language has been approved by other courts and scholars. *See Kuhlman v. Title Ins. Co.*, 177 *F.Supp.* 925 (W.D.Mo.1959) (excepting "[f]acts which would be disclosed by an accurate survey of the premises herein described"); *Muscat v. Lawyers Title Ins. Corp.*, 135 *Mich.App.* 26, 351 *N.W.*2d 893 (1984) (excepting "any matters which would be disclosed by an accurate survey and inspection of the premises"); *Heyd v. Chicago Title Ins. Co.*, 218 *Neb.* 296, 301, 354 *N.W.*2d 154, 157 (1984) (language excepting "any other matters which would be disclosed by an accurate survey and inspection of the premises" construed "as having plain and ordinary

meaning"); *Swanson v. Mid–South Title Ins. Co.*, 692 *S.W.*2d 415 (Tenn.App.1984) (excepting "other facts which a correct survey would show"); *see also* 7 *Powell on Real Property* § 1046 at 92–38 (1987 ed.) (*Powell*) (an exception excluding "any state of facts an accurate survey would disclose" described as a "common exception in most owners' policies"). Whatever else the phrase "other matters" might mean in a survey exception, it clearly refers to the dimensions of the lot lines and the size of the lot. The size of a tract simply cannot be ascertained with any certainty from a search of public records alone. The reason is that land exists on the ground, not on paper. When a description refers to a point in the line of another, only a survey can reveal the actual size of a piece of property and the amount of land included in a deed. A shortage in acreage is one of the facts that an accurate survey and inspection would disclose. Consequently, we reject the trial court's conclusion that the exception applies only to boundary, encroachment, and overlap disputes. For the same reason, we reject the court's conclusion that the exception applies only when a neighboring landowner brings an action against the insured.

We are likewise unpersuaded by the reasoning of the Appellate Division that an accurate survey would not disclose the shortage of acreage for the asserted reason that such a survey would be based on the metes and bounds description in the policy and that no discrepancy would appear between that description and the survey. That reasoning is so circular as to render the survey exception meaningless. If the exception applied only when the survey and the description are identical, the exception would not serve any purpose. The purpose of the survey exception is to exclude coverage when the insured fails to provide the insurer with a survey. 13A M. Lieberman, *New Jersey Practice* § 1701 at 194 (3d ed. 1966). From a search of relevant public records, a title company cannot ascertain the risks that an accurate survey would disclose. It is for this reason that the title company puts that risk on the insured, who

can control it either by obtaining a survey or arranging for the elimination of the survey exception. Thus, the very purpose of a survey exception is to exclude from coverage errors that would be revealed not by a search of public records, but by an accurate survey. In effect, plaintiff seeks to obtain a better policy than it purchased by transferring to the insurer a risk that it assumed. *See Last, supra,* 139 *N.J.Super.* 456. Had plaintiff obtained a survey from Duffy before the Kosa closing, instead of waiting until it wanted to subdivide the property, it could have eliminated the risk of paying for property it did not receive.

Finally, we disagree with the conclusion of the Appellate Division that the exception does not apply because the shortage in acreage was not discoverable by both an accurate survey and an inspection of the premises. A survey and inspection serve related but different purposes. The purpose of an inspection, which is performed by merely visiting the property, is to disclose such matters as physical encroachments, evidence of adverse use, and monuments. By comparison, a survey, as this case demonstrates, can involve extensive research and field work. Unlike a mere inspection, a survey relates the property as described in recorded instruments to the land as it exists. If Walker Rogge had obtained such a survey before closing, it would have known that it was purchasing only twelve, not eighteen, acres. Perhaps Rogge did not consult a lawyer or a surveyor because of the brief period of time between the signing of the contract and the closing. Rogge testified that Kosa insisted on a closing on or before December 31, 1979. Whatever the reason for closing on an accelerated schedule, Walker Rogge, not Chelsea, assumed the risk of closing without a survey. Furthermore, an inspection can be performed simply by visiting the property. It would distort the title policy to the point of illogic to expose Chelsea to the risk of the results of an accurate survey merely because those results could not be revealed by an inspection of the premises.

We now turn to plaintiff's negligence claim against Chelsea. In support of that claim, plaintiff points to Chelsea's separate charge for "title examination" and to its reliance on Chelsea to conduct a reasonable search. Courts and commentators, like the lower courts in this case, have divided on the question whether a title company should be exposed to liability in tort for negligence in searching records as well as to liability in contract under its policy of insurance.

The basic question is whether the issuance of the title commitment and policy places a duty on a title insurance company to search for and disclose to the insured any reasonably discoverable information that would affect the insured's decision to close the contract to purchase. In this state, the rule has been that a title company's liability is limited to the policy and that the company is not liable in tort for negligence in searching records. Underlying that rule is the premise that the duty of the title company, unlike the duty of a title searcher, does not depend on negligence, but on the agreement between the parties. *Booth v. New Jersey Highway Auth.*, 60 *N.J.Super.* 534 (Law Div.1960); *see also Caravan Prods. Co. v. Ritchie*, 55 *N.J.* 71, 74 (1969) (under title policy, "the liability to [the insured] is contractual and does not depend on negligence"); *Enright v. Lubow*, 202 *N.J.Super.* 58, 67 (App.Div. 1985) (contractual "nature of a title insurance policy and a title report" precludes negligence liability); Lieberman I, *supra*, § 222 at 142 ("no question of negligence is involved" under title policy); *Powell, supra*, § 1041 at 92–28 ("Under the contract of insurance, no question of negligence can arise * * *."). If, however, the title company agrees to conduct a search and provide the insured with an abstract of title in addition to the title policy, it may expose itself to liability for negligence as a title searcher in addition to its liability under the policy. *Trenton Potteries Co. v. Title Guar. & Trust Co.*, 176 *N.Y.* 65, 68 *N.E.* 132, 135 (1903). In that regard, the trial court expressly found that

> it is the conclusion of this court that plaintiff did not engage Chelsea to undertake two separate functions; that is, to prepare a title report, then a policy of title insurance. The title search which was completed by Chelsea was simply an internal procedure for Chelsea's own purposes in deciding whether or not to issue a title policy. Even though plaintiff was billed for the title search, it is the conclusion of this court that the real transaction between the parties was a policy of insurance. This conclusion means that plaintiff's remedy against Chelsea lies in contract, not in negligence. Consequently, the negligence charges against Chelsea are dismissed.

Notwithstanding Chelsea's separate $75 charge for "title examination," the trial court's finding is supported by substantial credible evidence in the record. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484 (1974). Chelsea conducted the search in conjunction with its obligation to issue the title commitment and policy. It did not prepare a separate abstract of title for plaintiff, but made the search for its own benefit.

Some out-of-state courts and commentators favor the view that a title company should be liable in tort as well as contract if it negligently fails to discover and disclose information that would be of interest to the insured. The underlying notion is that the insured has the reasonable expectation that the title company will search the title. 9 J. Appleman, *Insurance Law and Practice* § 5212 at 72 (1981); *see Note, Title Insurance: The Duty to Search,* 71 *Yale L.J.* 1161, 1171 (1962). In some jurisdictions, including New Jersey, that obligation is reinforced by a statutory obligation to make a reasonable title search. *N.J.S.A.* 17:46B–1 to –62; *see Alaska Stat.* § 21.66.170 (1984); *Ariz.Rev.Stat.Ann.* § 20–1567 (1975); *Colo.Rev.Stat.* § 10–11–106 (1987); *Fla.Stat.Ann.* 627.7845 (1984); *Haw.Rev. Stat.* § 431:20–113 (1988); *Kan.Stat.Ann.* § 40–235(b) (1986); *Mont.Code Ann.* § 33–25–214 (1987); *Neb.Rev.Stat.* § 44–1905 (1984); *Nev.Rev.Stat.* § 692A.220 (1986); *N.H.Rev.Stat.Ann.* § 416–A:6 (1983); *N.M.Stat.Ann.* § 59A–30–11 (1978 & Supp. 1988); *Tenn.Code Ann.* § 56–35–129 (1980 & Supp.1987); *Utah Code Ann.* § 31A–20–110 (1986). Two courts have focused on the title commitment and policy as imposing a duty on the company like that imposed on a title abstractor to "list all matters of public record adversely affecting title to real estate

which is the subject of the title report." *See Ford v. Guarantee Abstract & Title Co.*, 220 *Kan.* 244, 256–58, 553 *P.*2d 254, 264–66 (1976); *Heyd, supra*, 218 *Neb.* at 302–03, 354 *N.W.*2d at 158.

Other courts have acknowledged in *dictum* a title company's obligation to make a reasonable search. Those courts have been reluctant, however, to impose on the title companies a duty in tort. For example, in *L. Smirlock Realty Corp. v. Title Guar. Co.*, 52 *N.Y.*2d 179, 437 *N.Y.S.*2d 57, 418 *N.E.*2d 650 (1981), the New York Court of Appeals refused to invalidate a title policy for misrepresentation absent a showing of intentional concealment by the insured. Because no such showing had been made, the court held the company liable under its policy for failure to discover records showing the condemnation of access from the property to a public street. In reaching this result, the court wrote, "because title insurance companies combine their search and disclosure expertise with insurance protection [ ] an implied duty arises out of the title insurance agreement that the insurer has conducted a reasonably diligent search." *Id.* at 190, 437 *N.Y.S.*2d at 62, 418 *N.E.*2d at 655. Notwithstanding that statement, the court carefully pointed out that the basis for the imposition of liability on the company was the title policy, and the court was not reaching the question whether the company was liable in negligence. *Id.* 418 *N.E.*2d at 652. Similarly, the Illinois Appellate Court in a suit on the policy has stated that an "insurer has a duty to search the records and examine the applicable law before issuing its commitment or policy." *McLaughlin v. Attorneys' Title Guar. Fund*, 61 *Ill.App.*3d 911, 916, 18 *Ill.Dec.* 891, 895, 378 *N.E.*2d 355, 359 (Ill.App.Ct.1978). Although an intermediate court in Washington found a duty to search and disclose that arose by implication from the nature of the policy, *Shotwell v. Transamerica Title Ins. Co.*, 16 *Wash.App.* 627, 631, 558 *P.*2d 1359, 1361 (1976), on appeal the Washington Supreme Court expressly reserved the question of the existence of such a duty. 91 *Wash.*2d 161, 165–66, 588 *P.*2d 208, 211 (1978).

At one time the California courts adopted the view that a title company was subject to liability in tort similar to that of a title abstractor. *Jarchow v. Transamerica Title Ins.*, 48 *Cal. App.*3d 917, 122 *Cal.Rptr.* 470 (1975). In 1982, however, the California Legislature extinguished this cause of action by passing a statute that expressly stated that title commitments are not abstracts of title and that the issuance of a title commitment does not give rise to the same duties as are incurred when a company issues such an abstract. *Cal.Insurance Code* § 12340.11 (West 1988). More recently, the California courts have distinguished title commitments from an abstract of title by stating that a title commitment "generally constitutes no more than a statement of the terms and conditions upon which the insurer is willing to issue its title policy [and] liability for negligence based upon the [title commitment] in addition to liability under the policy does not seem supportable." *Lawrence v. Chicago Title Ins. Co.*, 192 *Cal.App.*3d 70, 76, 237 *Cal.Rptr.* 264, 268 (1987).

The prevailing view remains not to impose liability in tort on a title company. Two recent cases from the Idaho Supreme Court are particularly instructive. In the first case, *Anderson v. Title Ins. Co.*, 103 *Idaho* 875, 655 *P.*2d 82 (1982), the court rejected a claim that a title insurer should be liable in negligence. Because a title insurer does not purport to act as anything more than an insurance company, the court refused to allow a negligence action unless the insurer assumed the duty of searching title for the insured's benefit. The court stated that it "refuse[d] to impose the liabilities of an abstractor upon a title insurance company merely because it issued a preliminary title report." *Id.* at 879, 655 *P.*2d at 86 (note that there was no separate charge for the abstract in *Anderson* ). After *Anderson,* the legislature adopted a statute stating:

No title insurance on real property in the state of Idaho shall be issued unless and until the title insurer or its agent:

\* \* \* \* \* \* \* \*

(b) Has caused to be made a search and examination of the title and a determination of insurability of title in accordance with sound title underwriting practices. [*Idaho Code* § 41–2708(1)(b) (1977).]

Following the enactment of the statute, the Supreme Court revisited the issue in *Brown's Tie & Lumber v. Chicago Title,* 115 *Idaho* 56, 764 *P.*2d 423 (1988). In that case, the court ruled that the statute did not impose on the insurer a duty running to the plaintiff to conduct a reasonable search before issuing an insurance policy. Thus, the court reaffirmed that only a title examiner can be held liable for negligence. In reaching that result, the court stated that allegations of negligent performance of duties under the statute are merely a form of breach of contract. According to the court, the title company's duty is set forth in the contract, and the standard of performance can be measured by reference to the contract. *Id.* at 60, 764 *P.*2d at 427.

Similarly, the Supreme Court of New Mexico has refused to hold a title company liable when it failed to discover a recorded adverse claim. The court held that "[d]efendant clearly had no duty under the policy to search the records, and any search it may have actually undertaken, was undertaken solely for its own protection as indemnitor against losses covered by its policy." *Horn v. Lawyers Title Ins. Co.,* 89 *N.M.* 709, 711, 557 *P.*2d 206, 208 (1976).

The Texas Court of Appeals has reached a similar result. As that court recently stated, "[t]he title insurance company is not, as is an abstract company, employed to examine title; rather, the title insurance company is employed to guarantee the status of title and to insure against existing defects. Thus, the relationship between the parties is limited to that of indemnitor and indemnitee." *Houston Title Co. v. Ojeda de Toca,* 733 *S.W.*2d 325, 327 (1987); *see also Tamburine v. Center Sav. Ass'n,* 583 *S.W.*2d 942, 949 (1979) (in conducting a search in order to decide whether to insure property, "the company does not act in behalf of the party to be insured, but acts exclusively for itself."). Finally, the Colorado Court of Appeals stated that

a title company could not be held liable in negligence in·a case in which the insurer had excepted building-code violations from coverage under the policy. *Arapahoe Land Title v. Contract Fin., Ltd.*, 28 *Colo.App.* 393, 472 *P.*2d 754 (1970). Thus, in New Jersey, as elsewhere, courts are disinclined to impose liability on the basis of tort, as distinguished from contract, principles.

Although we recognize that an insured expects that a title company will conduct a reasonable title examination, the relationship between the company and the insured is essentially contractual. *See Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 *N.J.* 555, 579–80 (1985). The end result of the relationship between the title company and the insured is the issuance of the policy. To this extent, the relationship differs from other relationships conceivably sounding in both tort and contract, such as the relationship between physician and patient, to which plaintiff alludes. Although the relationship between physician and patient is contractual in its origins, the purpose of the relationship is to obtain the services of the physician in treating the patient. The patient reasonably expects the physician to follow the appropriate standard of care when providing those services. By contrast, the title company is providing not services, but a policy of insurance. That policy appropriately limits the rights and duties of the parties.

From this perspective, the insured expects that in consideration for payment of the premium, it will receive a policy of insurance. The insurer's expectation is that in exchange for that premium it will insure against certain risks subject to the terms of the policy. If the title company fails to conduct a reasonable title examination or, having conducted such an examination, fails to disclose the results to the insured, then it runs the risk of liability under the policy. In many, if not most, cases conduct that would constitute the failure to make a reasonable title search would also result in a breach of the terms of the policy.

The expectation of the insured that the insurer will conduct a reasonable search does not necessarily mean that the insurer may not limit its liability in the title commitment and policy. If the company may not so limit its liability, then it would be exposed to consequential damages resulting from its negligence. Under general contract principles, however, consequential damages are not recoverable unless they were within the specific contemplation of the parties. *Donovan v. Bachstadt,* 91 *N.J.* 434, 444–45 (1982). Another difference is that in an action under the title policy, the insured may establish a cause of action for breach of contract without establishing that the title company breached the standard of care appropriate for a reasonable title search. In an action in tort for the failure to conduct such a search, the insured would be required to establish the appropriate standard of care applicable to title searching.

Both Chelsea and *amicus,* New Jersey Land Title Association, recognize that negligence principles provide an alternative basis for imposing liability on Chelsea. Notwithstanding the essentially contractual nature of the relationship between a title company and its insured, the company could be subject to a negligence action if the "act complained of was the direct result of duties voluntarily assumed by the insurer in addition to the mere contract to insure title." *Brown's Tie, supra,* 115 *Idaho* at 59, 764 *P.*2d at 426. As support for its negligence claim against Chelsea, Walker Rogge points to various facts. For example, Chelsea had twice insured the property in question and on four other occasions it had opened files on the property. In addition, Chelsea's own back title plant reflected that the tract comprised twelve, not eighteen, acres. One of Chelsea's employees, moreover, supervised the closing, at which time the purchase price was computed on that basis. Because it restricted plaintiff's claim to the policy, the trial court did not determine whether Chelsea knew or should have known of the difference in acreage and of its materiality to the transaction. The court did not, therefore, determine whether Chelsea as-

sumed an independent duty to assure the quantity of acreage, whether it breached that duty, or whether the breach caused any damage to Walker Rogge. Consequently, we are obliged to remand the matter to the trial court for a determination of those issues. In remanding, we do not decide whether Chelsea was obligated to bring the difference in acreage to the attention of its insured under an implied duty of fair dealing. That issue has played no role at the trial or appellate level. We leave to the discretion of the trial court whether the matter should be resolved on the present record or should be supplemented by additional testimony.

–III–

 We now turn to the plaintiff's claim against the surveyors. The trial court dismissed plaintiff's negligence actions against Hood and Price at the close of the plaintiff's case because of a lack of expert testimony on the standard of care for surveyors. The Appellate Division affirmed. 222 *N.J.Super.* at 375–76. We agree that the negligence claims should be dismissed.

As presented to the Law and Appellate Divisions, the sole basis for plaintiff's claim against Hood and Price was their alleged negligence. Before us, however, plaintiff argues for the first time, and without citing any authority, that Hood and Price are liable under the certification signed by Hood in the updated 1975 survey. That certification provided:

> To: any Insuror of Title relying hereon and any other party in interest:
>
> In consideration of the fee paid for making this survey, I hereby certify and guarantee its accuracy (except as to such easements, if any, that may be located below the surface of the lands or on the surface of the lands and not visible) as an inducement for any insuror of title to insure the title to the lands and premises shown thereon.

The issue is hardly ripe for consideration. Although raised too late and too casually for us to consider, the issue is of sufficient importance to merit consideration on remand in the Law Division.

The judgment of the Appellate Division is affirmed in part, reversed in part, and, as modified, the matter is remanded to the Law Division.

*For affirmance in part, reversal in part, modification and remandment*—Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*Opposed*—None.