**STEWART TITLE GUARANTY CO., Plaintiff,**

v.

**GREENLANDS REALTY, L.L.C., Defendant,**

v.

**Stewart Title Guaranty Co., Title Company of New Jersey and Sun International of North America, Inc., Additional Counterclaim Defendants.**

No. CIV. A. 97–3577.

United States District Court, D. New Jersey.

July 20, 1999.

372

Stuart Alderoty, David P. Kalm, Leboeuf, Lamb, Greene & Macrae, L.L.P., Newark, NJ, for Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company and Additional Counterclaim Defendant, Title Company of New Jersey.

Linda J. Cohen, Cozen and O'Connor, Westmont, NJ, Robert W. Hayes, Cozen and O'Connor, Philadelphia, PA, for Defendant, Greenlands Realty, L.L.C.

Philip B. Seaton, Gregory A. Lomax, Kozlov, Seaton, Romanini, Brooks, & Greenberg, Cherry Hill, NJ, for Additional Counterclaim Defendant, Sun International of North America, Inc.

## OPINION

ORLOFSKY, District Judge.

This case requires me to revisit the concept of marketability of title,[1] and consider whether every defect in title renders title unmarketable. I must also examine the nebulous line dividing the realm of contract law from that of tort law by applying the New Jersey Supreme Court's holding in *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 116 N.J. 517, 562 A.2d 208 (1989).

The dispute arises out of an agreement between Defendant, Greenlands Realty, L.L.C. ("Greenlands"), and Additional Counterclaim Defendant, Sun International of North America, Inc. ("Sun"), in which Sun agreed to purchase property known as 1315 Boardwalk, located in Atlantic City, New Jersey from Greenlands. Sun terminated this purchase agreement, claiming that title to 1315 Boardwalk was neither marketable nor insurable. Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company ("Stewart Title"), who insured title to the property, and Additional Counterclaim Defendant, Title Company of New Jersey ("TCJ"), who investigated titled for Stewart Title, have moved for summary judgment on Count II of their Complaint and on all counts asserted against them in Greenlands's Counterclaim.[2] Specifically, Stewart Title and

---

1. I previously examined the concept of marketability of title in my Opinion of May 12, 1999, in this case. *See Stewart Title Guar. Co. v. Greenlands Realty, L.L.C.*, Civil Action No. 97–3577, 58 F.Supp.2d 360 (D.N.J. May 12, 1999).

2. Counts III through X of the Counterclaim contain the claims that Greenlands has asserted against Stewart Title and TCJ. In Counts I and II, Greenlands has asserted claims against Sun.

TCJ (collectively, the "Title Companies") argue that Stewart Title has fulfilled all of its obligations under the title insurance policy it issued to Greenlands, and that all of Greenlands's tort claims are precluded by the "Economic Loss Doctrine." This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties, and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

In my last opinion in this case, filed May 12, 1999, I concluded that the title to 1315 Boardwalk was marketable. Thus, I will consider the Title Companies' motion for summary judgment in light of that holding.

For the reasons set forth below, I find that there are several genuine issues of material fact with respect to whether or not the Title Companies acted in good faith, honestly, and with reasonable diligence in their dealings with Greenlands. As a result of this finding, I hold that I must deny the Title Companies' motion for summary judgment on: (1) Count II of the Complaint, which seeks a declaratory judgment finding that Stewart Title has fulfilled its obligations under the title insurance policy issued to Greenlands; (2) Count III of the Counterclaim, asserting a claim for slander of title against the Title Companies; (3) Count V of the Counterclaim, asserting a claim for breach of contract against Stewart Title; and (4) Count X of the Counterclaim, asserting a claim under the New Jersey Unfair Trade Practices Act, N.J. Stat. Ann. § 56:8–2,[3] against the Title Companies. Therefore, I will deny the Title Companies' motion for summary judgment on Counts III, V, and X of the Counterclaim.

These same genuine issues of material fact require that I grant in part, and deny in part, the Title Companies' motion for summary judgment with respect to the part of Count VIII of the Counterclaim, which alleges a claim of bad faith, that relates to Stewart Title's conduct in con-nection with the title insurance policy that it issued to Greenlands. By contrast, I hold that Greenlands may only assert a claim for bad faith in connection with a contractual relationship. Because I have found that there is absolutely no evidence in the summary judgment record that Greenlands had a contractual relationship with TCJ, I will grant the Title Companies' motion for summary judgment on Count VIII of the Counterclaim asserted against TCJ. Further, I will also grant the motion for summary judgment with respect to Greenlands's allegations, asserted as part of Count VIII of the Counterclaim, that Stewart Title acted in bad faith while negotiating a commitment for title insurance for Sun.

Finally, I will grant the motion for summary judgment on: (1) Count IV of the Counterclaim, which alleges a claim of breach of fiduciary duty against Stewart Title, because, under *Walker Rogge*, the availability of contractual remedies to Greenlands prohibit it from pursuing tort remedies; (2) Count VI of the Counterclaim, which alleges a claim of negligent title search against TCJ, because there is no evidence in the summary judgment record that TCJ voluntarily assumed the duty to conduct a title search; (3) Count VII of the Counterclaim, which asserts a breach of contract claim against TCJ, since there is no evidence in the summary judgment record that Greenlands and TCJ entered into a contract; and, (4) Count IX of the Counterclaim, which asserts a claim of negligent misrepresentation against the Title Companies, because, under *Walker Rogge*, Greenlands cannot pursue tort remedies where it has a remedy available in contract.

## I. FACTUAL AND PROCEDURAL BACKGROUND

I have already addressed the factual background of this case in my Opinion of May 12, 1999. The issues presented by

---

**3.** *See* Section III.B.4 for the complete text of the statute.

the Title Companies' motion for summary judgment, however, require that I consider additional events beyond those discussed in my last Opinion. Accordingly, I will focus my discussion of the factual background on events not considered in my previous Opinion, however, where necessary I will repeat some of the background from my last Opinion.

On April 29, 1996, Joseph Zoll ("Zoll") entered into an agreement to purchase property, located at and known as 1315 Boardwalk, in Atlantic City, from F.W. Woolworth's ("Woolworth") for $1,100,000. *See* First Amended Counterclaims ("Counterclaim"), filed Mar. 13, 1998, ¶ 8. "After Zoll signed the contract to purchase 1315 Boardwalk, 'Greenlands Realty, L.L.C.[, of which Zoll is] a managing member[,] was formed and [Zoll] assigned [his] rights under the Woolworth agreement to Greenlands which then exercised those rights by purchasing the property.'" *Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.,* Civil Action No. 97–3577, 1999 WL 308713, at *2, 58 F.Supp.2d 360, —— (D.N.J.1999) (quoting Affidavit of Joseph Zoll in Support of Defendant/Counterclaim Plaintiff Greeland[s] Realty, L.L.C.'s Motion for Summary Judgment ("Zoll Cert."), filed Nov. 19, 1998, ¶ 3).

The property consisted of "two parcels, the 'main parcel' and the 'strip,' a three-foot wide segment of land running from the main parcel to the street." *Id.; see also* Certification of William P. Fitzgerald, dated Nov. 17, 1998, Ex. B (Ponzio Survey showing map of the property).[4] "The main parcel front[ed] the boardwalk and the strip connect[ed] the back of the main parcel with South Carolina Avenue, which is 110 feet from the western edge of the main parcel." *Id.* Both Zoll and Woolworth, however, did not realize that the

strip was part of the property. *See* Counterclaim ¶ 11. That is, Woolworth did not realize that it had title to the strip. "As part of the closing of Greenlands'[s] purchase of the Property from Woolworth, a survey of the lot was made by Arthur Ponzio[, which] revealed that [the s]trip ... constituted part of the ... lot being sold by Woolworth." Certification of Robert Hayes ("Hayes Cert."), Dec. 18, 1998, Ex. 14 (Verification of William W. Shultz, Esq., in Support of Defendant/Counterclaim Plaintiff Greenlands Realty, L.L.C.'s Motion for Summary Judgment, Oct. 2, 1998, ¶ 3). "Upon discussing the results of this survey with Woolworth, the company agreed to convey that [s]trip of land to Greenlands as part of the closing of the entire tax block and lot which Woolworth owned and was selling to Greenlands." *Id.*

On April 26, 1996, just three days before Zoll signed the purchase agreement with Woolworth, Zoll obtained a commitment for title insurance from Stewart Title, covering just the main parcel and not the strip, since, at the time, Zoll did not know that the strip was part of 1315 Boardwalk. *See* Hayes Cert., Ex. 3 (Commitment for Title Insurance, issued by Stewart Title, dated Apr. 26, 1997). The title commitment attached all of the deeds for the property, the results of a title search performed by TCJ. *See id.* Neither the commitment for title insurance nor the set of deeds, however, included an abstract of title.[5] *See id.* Further, although Greenlands alleges in its Counterclaim that it "entered into a contract with [TCJ] to abstract title to the Property for the independent purpose of verifying good and marketable title to the entire Property when Greenlands purchased it from F.W. Woolworth Co," Counterclaim ¶ 12, Green-

---

4. As part of this background section, I have relied upon the certifications filed in connection with motions for summary judgment filed by Sun and Greenlands, as well as those filed in connection with the Title Companies' motion for summary judgment, which is currently before me.

5. An abstract of title is a "[m]emorandum or concise statement in orderly form of the substance of documents or facts appearing on public records which affect title to real property." *Black's Law Dictionary* 10 (6th ed.1990).

lands could not provide a copy of this abstract when requested to do so by counsel for the Title Companies. *See* Certification of Stuart Alderoty ("Alderoty Cert."), filed Dec. 18, 1998, Ex. B (Letter from David P. Kalm, Esq., to Douglas R. Widen, Esq., dated Dec. 2, 1997, requesting a copy of the abstract); *see also* Brief in Support of Motion for Summary Judgment on Plaintiff's Complaint and Dismissing Counterclaims as to Stewart Title Guaranty Company and the Title Company of New Jersey ("Pl.'s Brief"), filed Dec. 18, 1998, at 6–7 n.4 (noting that "Greenlands never responded [to the request for the abstract] because it could not"). The only evidence that Greenlands has presented that TCJ performed a title search and produced an abstract for Greenlands is the "Charge Breakdown and Worksheet" from TCJ, which charges Greenlands for a variety of "searches," including a . "tax search," an "upper courts" search, several "corporate searches," one "tideland search[ ]," and "other." [6] Hayes Cert., Ex. 15. The total charge for "searches" amounted to $257.90. *Id.*

Approximately ten days after Stewart Title issued the April 26, 1996, commitment for title insurance, TCJ performed a title search for Stewart Title, which revealed a "discrepancy" suggesting that the "strip of property reposed in fee simple, in clear fee simple in Boardwalk Realty Company" ("Boardwalk").[7] Hayes Cert., Ex. 5 (Likens Dep. Tr. at 119). After discovering this "discrepancy," Edward J. Likens, the TCJ title officer who examined the title to 1315 Boardwalk for Stewart Title, concluded that Greenlands, despite the "discrepancy," held title to the strip. *See id.* (Likens Dep. Tr. at 16, 83–85).[8] Similarly, William P. Gillingham, Executive Vice President of TCJ, testified, in his deposition, that he believed that the discrepancy was a scrivener's error and did not affect Greenlands's title to the strip. *See* Appendix of Greenlands Realty, L.L.C. in Support of Motion for Summary Judgment as to Count I of Its Counterclaim for Breach of Contract Against Counterclaim Defendant, Sun International of North America ("App."), Ex. N (Gillingham Dep. Tr. at 60); *see also* Alderoty Cert., Ex. G (Verifying Affidavit of William P. Gillingham in Support of Plaintiff's Complaint, dated Aug. 21, 1997, ¶ 4, filed in *Greenlands Realty, L.L.C. v. Boardwalk Realty Co.*, Civil Action No. ATL–C–135–97E, New Jersey Superior Court, Atlantic County, Chancery Division) ("I can unequivocally state that as a result of my

6. Although someone wrote the word "ABSTRACT" on the top of the title commitment, *see* Hayes Cert., Ex. 3, this act does not unilaterally convert a commitment for title insurance, with an attached set of deeds, into an abstract of title.

7. *See generally Stewart Title Guar. Co. v. Greenlands Realty, L.L.C.*, Civil Action No. 97–3577, 58 F.Supp.2d 360 (D.N.J.1999) (providing a more detailed description of the alleged defect in Greenlands's title).

8. Likens, however, also testified in his deposition that the sale of the property from Woolworth to Greenlands could not include the strip, because Boardwalk still possessed title to that piece of 1315 Boardwalk. *See* Hayes Cert., Ex. 5 (Likens Dep. Tr. at 124). Further, Stewart Title contends that it never intended to provide title insurance covering the strip, however, the fact that Stewart Title did not attempt to correct this mistake until June 27, 1997, *see* Certification of Gregory A. Lomax, Esq. ("Lomax Cert."), filed Nov. 19, 1998, Ex. F (Letter from William P. Gillingham, dated June 27, 1997, stating that Stewart Title "made a mistake when [it] issued" an insurance policy covering the strip, because "[t]his strip is owned by Boardwalk"), the day after Greenlands's title was challenged by a possible purchaser, weakens the credibility of this position. While I cannot weigh the evidence as part of a motion for summary judgment, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), I must draw all reasonable inferences in favor of the party opposing summary judgment. *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). Regardless, Greenlands has presented sufficient evidence from which I find that there is a genuine issue of material fact with respect to whether or not Stewart Title believed that Greenlands possessed title to the strip upon the issuance of the April 26, 1996, commitment for title insurance.

examination, review and communications, to the best of my knowledge, .... it was as a result of inadvertence or mistake that Boardwalk failed to specifically describe the [strip] when it conveyed title to the Property to Colsey in 1970."). Indeed, Gillingham testified that at no time did he ever believe that the discrepancy was more than a scrivener's error.[9] *See id.*

On July 5, 1996, Zoll and Woolworth conducted the closing on the purchase agreement, at which time Woolworth transferred two deeds to Zoll, one for the main parcel, dated June 27, 1996, and a quit claim deed to the strip, dated June 28, 1996. App., Ex. C–7. That same day, Stewart Title issued a title insurance policy to Greenlands, covering both the main parcel and the strip. Alderoty Cert., Ex. E (Insurance Policy). The title policy covered:

> by Deed from F.W. Woolworth Co., a New York corporation dated June 27, 1996, recorded July 5, 1996 in Deed Book 5988 Page 71 in the ATLANTIC County Clerk's office.
>
> by Quit Claim Deed from F.W. Woolworth Co., a New York corporation dated June 28, 1997 recorded July 5, 1996 in Deed Book 5988, page 75 in the ATLANTIC County Clerk's office.

*Id.*[10] The policy provided protection against:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

4. Lack of a right of access to and from the land.

*Id.*

" 'Even before the closing between Greenlands and Woolworth was completed, [Zoll] was approached by the representative of an undisclosed principal who inquired ... whether Greenlands would sell the Property it was buying from Woolworth.' " *Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.*, 58 F.Supp.2d 360, 362 (D.N.J. 1999) (quoting Zoll Cert. ¶ 3). " 'As a result of that inquiry, negotiations began and those negotiations resulted in a September 4, 1997, Agreement of Sale wherein Griffin Gaming and Entertainment, Inc .... agreed to pay the sum of Five Million ($5,000,000.00) Dollars for the Property.' " *Id.* (quoting Zoll Cert. ¶ 3); *see also* Zoll Cert., Ex. A–1 (Agreement of Sale). " 'In the period between the execution of the Griffin Agreement and the scheduled closing, Griffin merged into a subsidiary of Sun International, Inc., with Sun emerging as the surviving corporation.' " *Stewart Title*, 58 F.Supp.2d at 362 (quoting Statement of Undisputed Facts of Defendant/Counterclaim Plaintiff Greenlands[ ] Realty L.L.C. in Support of Motion for Summary Judgment as to Count I ("Greenlands's Statement"), filed Nov. 19, 1998, ¶ 39); *see also* Sun's Statement of Disputed Facts as to Greenlands'[s] Statement of Undisputed Facts in Support of Motion for Summary Judgment as to Count I, filed Nov. 19, 1998, ¶ 39

---

9. Gillingham, just like Likens, contradicted his own testimony. In a letter, dated June 27, 1997, Gillingham stated that, as a result of the discrepancy, the "strip is owned by Boardwalk Realty Company by deed recorded in the 1920's [sic]." Lomax Cert., Ex. F.

10. Almost a year later, on June 27, 1997, Stewart Title attempted to alter the insurance policy unilaterally, claiming that its agreement to provide coverage over the strip was an error. *See* Lomax Cert., Ex. F. Because Greenlands never agreed to this modification of the insurance policy, Stewart Title's attempt to delete the strip from the coverage of the policy was futile. *See Van Dusen Aircraft Supplies, Inc. v. Terminal Contr. Corp.*, 3 N.J. 321, 326, 70 A.2d 65 (1949) (holding that " 'it is settled law that parties to an existing contract may, by mutual consent, modify or change it by altering or excising certain of its provisions, or by adding new provisions thereto' ") (quoting *Ball v. Metal–wash Machinery Co., Inc.*, 123 N.J.L. 285, 289, 8 A.2d 370 (1939)). Stewart Title has not attempted to argue otherwise.

("Agreed."). "'Sun succeeded to Griffin's rights and obligations under the Griffin Agreement.'" *Stewart Title*, 58 F.Supp.2d at 362 (quoting Greenlands's Statement ¶ 39).

Under the Agreement of Sale, "[t]he Closing of the purchase and sale of the Property [was to] take place at 10:00 a.m. on July 3, 1997." *Id.* (quoting Agreement of Sale ¶ 6). The Agreement also provided that: "'[t]ime is of the essence.'" *Id.* (quoting Agreement of Sale ¶ 6).

Early in February of 1997, Arthur Sklar, Esq., approached Stewart Title, on behalf of Sun, to request a title commitment for the property. Hayes Cert., Ex. 4–A (Application for Commitment for Title Insurance, dated Feb. 7, 1997). On February 14, 1997, Sun received two commitments for title insurance from Stewart Title, one for the main parcel and one for the strip. *See* Hayes Cert., Exs. 6 (main parcel), 9 (strip). Unlike the title insurance policy that Stewart Title issued to Greenlands, this set of commitments noted that Boardwalk, and not Greenlands, held title to the strip. *See id.* In his deposition, Likens testified that this change resulted from a conference call between Sklar, Gillingham, and Likens, in which Sklar described how "he felt that title should have been" represented. *See id.*, Ex. 5 (Likens Dep. Tr. at 87). Nothing "Sklar said convince[d Likens] that, in fact, Boardwalk had superior title to Greenlands," rather, it was Sklar's mere conclusory statement that motivated TCJ, and, in turn, Stewart Title to state that Greenlands did not hold title to the strip. *See id.* (Likens Dep. Tr. at 91).

In the subsequent months, TCJ further searched title to the strip. *See id.*, Ex. 10 (collected documents regarding title to the strip, from March and April of 1997). As part of this investigation, TCJ discovered that Boardwalk had dissolved on March 10, 1970. *See id.* Then, on June 17, 1997, after TCJ's more detailed investigation of the title to the strip, Stewart Title issued a commitment for title insurance that included both the main parcel and the strip, which noted that the quitclaim deed from Woolworth to Greenlands did, in fact, convey the strip to Greenlands. *See id.*, Ex. 12. This commitment, however, required "[p]roduction of a certified copy of the Resolution of the Board of Directors of Boardwalk Realty Company, its successors and/or assigns authorizing the sale and conveyance of the premises in question TO BE AGREED UPON." *Id.* Additionally, this commitment noted: "We find Fee Simple Title to [the strip] vested in Boardwalk Realty Company.... The said Boardwalk Realty Company failed to include [the strip] in the subsequent Deed of conveyance." *Id.*

Sklar, counsel for Sun, however, "was dissatisfied with the form of" the June 17, 1997, commitment for title insurance. *Id.*, Ex. 11 (Gillingham Dep. Tr. at 112). Stewart Title changed the commitment for title insurance to conform with "[w]hatever [Sklar's] requests were." *Id.* Indeed, Stewart Title was willing to do "whatever [Sklar] wanted ... [w]ithin the realm of title insurance." *Id.* (Gillingham Dep. Tr. at 112–13). As a result, on June 26, 1997, Stewart Title sent Sklar, by facsimile, a revised commitment for title,[11] with the following note: "Please review & let me know if you feel this is more consistent." *Id.*, Ex. 13. The June 26, 1997, version of the commitment for title insurance covered both parcels, however, it contained an exception for an "[o]utstanding estate and interest of Boardwalk Realty Company, its successors and/or assigns, in and to [the strip] of [1315 Boardwalk]." *Id.*

11. While this revised version of the commitment for title insurance issued to Sklar was the third version, the document is inaccurately labeled "second revision." *See* Hayes Cert., Ex. 13. Both the second version, dated June 17, 1997, and third version, dated June 26, 1997, are labeled "second revision." *See* Hayes Cert., Exs. 12 (June 17, 1997, version) & 13 (June 26, 1997, version).

On June 26, 1997, the same day that William Gillingham sent Sklar the third version of the commitment for title insurance, and exactly one week before the closing date on the purchase agreement between Greenlands and Sun, Sklar sent a letter to Greenlands, stating:

> Title commitment # 31113278 dated June 4, 1997 issued by [TCJ] (the "Title Commitment") indicates that title to [the strip] . . . is vested in Boardwalk Realty Company. A copy of the Title Commitment is enclosed. As [the strip] appears to be a part of Lot 161, Block 20 on the official Tax Map of Atlantic City, title to the Property does not appear to be marketable or insurable based on the Title Commitment. This is to advise you Sun is unwilling to accept less than good, marketable and insurable title to the Property.

Alderoty Cert., Ex. C (Letter from Arthur Sklar, Esq., to Greenlands Realty, L.L.C., dated June 26, 1997). With only a week to cure the alleged defect, Greenlands had little recourse. On the July 3, 1997, closing date, Sun refused to close. *See* Verification of William W. Shultz, Esq., in Opposition to Counterclaim Defendant Sun International of North America, Inc.'s Motion to Dismiss, filed June 19, 1998, Ex. 1 (Letter from Arthur Sklar, Esq., to William Shultz, Esq., dated July 3, 1997, explaining Sun's reason for its refusal to close).

"By letter dated July 3, 1997, Greenlands submitted to Stewart [Title] a notice of claim under the Title Policy." Counterclaim ¶ 54. In response, on August 27, 1997, Stewart Title instituted an action in the New Jersey Superior Court, to quiet title to the strip and obtain a confirmatory deed to the strip. *See Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.,* 58 F.Supp.2d 360, 364 (D.N.J. 1999). "The New Jersey Superior Court, Chancery Division, determined that Boardwalk's failure to include a metes and bounds description of the strip in the 1970 deed to Colsey and

Mahon was a mistake and, as a result, the court appointed Nancy Gemmel, Esq., 'as a commissioner in accordance with [N.J. Stat. Ann. § ] 46:7–1 to execute [a] Confirmatory Deed.'" *Id.* (quoting Judgment, filed Oct. 15, 1997, in *Greenlands Realty, L.L.C. v. Boardwalk Realty Co.,* Civil Action No. ATL–C–135–97E, New Jersey Superior Court, Atlantic County, Chancery Division). "On November 18, 1997, Ms. Gemmel signed a confirmatory deed to the strip on behalf of Greenlands." *Id.* "After obtaining the confirmatory deed, Stewart Title then filed this action, seeking a declaratory judgment that it was not obligated to provide coverage for any loss that Greenlands might have sustained as a result of Sun's termination of the Agreement of Sale." *Id.*

In my Opinion and Order of May 12, 1999, *see id.,* I concluded that Greenlands possessed marketable title, because "Boardwalk intended to convey title to the strip and its failure to include a metes and bounds description of the strip in the deed was a scrivener's error" and, therefore, "none of Boardwalk's successors-in-interest can assert a viable claim, nor are they likely to attempt to do so." *Id.* at *10. Now I must consider the motion for summary judgment of the Title Companies, which addresses Count II of the Complaint and Counts III through X of Greenlands's Counterclaim.

## II. LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997); *Hersh v. Allen Prod. Co.,* 789 F.2d 230, 232 (3d Cir.1986). In deciding whether there is a disputed issue of material fact, the Court must view the underly-

ing facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995); *Hancock Indus. v. Schaeffer,* 811 F.2d 225, 231 (3d Cir.1987).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)); *see also Lujan v. National Wildlife Fed.,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the First Amended Complaint ... with conclusory allegations of an affidavit."); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992) ("[T]o raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather must

exceed the "'mere scintilla' threshold."), *cert. denied,* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). If the non-moving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.,* 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey,* 873 F.2d 17, 21 (1st Cir.1989)).

Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed.R.Civ.P. 56(e); *see Anchorage Assocs.,* 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movant only if it entitled to a judgment as a matter of law. *See Anchorage Assocs.,* 922 F.2d at 175.

## III. DISCUSSION

### A. Contract Claims

#### 1. Count V of the Counterclaim: Breach of Contract Claim Asserted Against Stewart Title

The title insurance policy issued by Stewart Title to Greenlands provides protection against:

1. Title to the estate or interest described in Schedule A being vested other than as stated therein;

2. Any defect in or lien or encumbrance on the title;

3. Unmarketability of the title;

4. Lack of a right of access to and from the land.

Alderoty Cert., Ex. E (Insurance Policy). Further, the title insurance policy described the estate in Schedule A as follows:

by Deed from F.W. Woolworth Co., a New York corporation dated June 27, 1996, recorded July 5, 1996 in Deed

Book 5988 Page 71 in the ATLANTIC County Clerk's office.

by Quit Claim Deed from F.W. Woolworth Co., a New York corporation dated June 28, 1997 recorded July 5, 1996 in Deed Book 5988, page 75 in the ATLANTIC County Clerk's office.

*Id.* Thus, the estate was accurately described in Schedule A and, therefore, the first item, "[t]itle to the estate or interest described in Schedule A being vested other than as stated therein," is not at issue here. Similarly, there are no allegations that Greenlands lacked a right of access to or from the land and, therefore, that provision of the policy is not at issue.

By contrast, Greenlands contends that Sun's refusal to close based on Sun's own determination that Greenlands lacked marketable title, triggers the provision of the policy that protects against unmarketable title. *See* Memorandum of Law of Defendant/Counterclaim Plaintiff Greenlands Realty, L.L.C. In Opposition to Plaintiff/Counterclaim Defendant Stewart Title Guarantee [sic] Co.'s and Counterclaim Defendant Title Company of Jersey's Motion for Summary Judgment Dismissing Counterclaims of Greenlands Realty, L.L.C. as to Stewart Title Guarantee [sic] Co. and the Title Company of Jersey ("Opposition"), dated Dec. 11, 1998, at 16–17. This Court, however, in its Opinion and Order of May 12, 1999, determined that title was marketable. *See Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.,* 58 F.Supp.2d 360 (D.N.J. 1999). As a result, Stewart Title cannot possibly have an obligation to protect against unmarketable title, where title was found to be marketable.

This conclusion, however, does not resolve the issue of whether Stewart Title may have had an obligation under Greenlands's title insurance policy, because I have not yet examined the provision of the policy, which protects against "[a]ny defect in or lien or encumbrance on the title." *See* Alderoty Cert., Ex. E. Whether this provision requires Stewart Title to fulfill any obligations under the title insurance policy is a question of contract construction for the Court. *See Nester v. O'Donnell,* 301 N.J.Super. 198, 210, 693 A.2d 1214 (N.J.Super.Ct.App.Div.1997).

 "Certain well-established rules for interpreting insurance policies have developed from that understanding of the nature of insurance policies." *Gibson v. Callaghan,* 158 N.J. 662, 730 A.2d 1278, 1282 (1999). A title insurance policy "is subject to the same rules of construction as are other insurance policies." *Sandler v. New Jersey Realty Title Ins. Co.,* 36 N.J. 471, 479, 178 A.2d 1 (1962). "Generally, the words of an insurance policy are to be given their plain, ordinary meaning." *Gibson,* 730 A.2d at 1282. "Basic to this problem of construction is a recognition of the principle that in such policies the phraseology must be liberally construed in favor of the insured and strictly construed against the insurer." *Sandler,* 36 N.J. at 479, 178 A.2d 1; *see also Gibson,* 730 A.2d at 1282; *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.,* 116 N.J. 517, 528–29, 562 A.2d 208 (1989). "Further, they must be interpreted in a way which fulfills the reasonable expectations of the insured." *Summonte v. First American Title Ins. Co.,* 180 N.J.Super. 605, 610, 436 A.2d 110 (Ch. Div.), *aff'd,* 184 N.J.Super. 96, 445 A.2d 409 (1981), *certif. denied,* 89 N.J. 418, 446 A.2d 148 (1982); *see also Gibson,* 730 A.2d at 1282. "Notwithstanding th[ose] principle[s] of construction, courts should not write for the insured a better policy of insurance than the one purchased." *Walker Rogge,* 116 N.J. at 529, 562 A.2d 208. Thus, "a court must enforce the policy as written when its meaning and language is clear and unambiguous," *United States Bronze Powders, Inc. v. Commerce & Indus. Ins. Co.,* 259 N.J.Super. 109, 115, 611 A.2d 667 (Law Div.1992), and the terms do not contradict the reasonable expectations of the insured. *See Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 338, 495 A.2d 406 (1985).

■ This case requires the Court to define "defect" as used in the title insurance policy issued by Stewart Title to Greenlands. A "defect" in title is: "[t]he want or absence of something necessary for completeness or perfection; a lack or absence of something essential to completeness; a deficiency in something essential to the proper use for the purpose for which a thing is to be used." *Mc Minn v. Damurjian,* 105 N.J.Super. 132, 139, 251 A.2d 310 (Ch.Div.1969) (quoting *Black's Law Dictionary* 509 (4th ed.1968)); *see also Bel–Air Motel Corp. v. Title Ins. Co.,* 183 N.J.Super. 551, 555, 444 A.2d 1119 (Law Div.1981) (same). This definition makes clear that a "defect" is something less than "unmarketability." Moreover, if defect was synonymous with "unmarketability," there would be no reason for the policy to list both terms. That is, unless there are defects that do not render a title unmarketable, the inclusion of the word "defect" in the list of coverage would be superfluous.

■ This interpretation of the word "defect" as used in Greenlands's title insurance policy accords with the definition of "unmarketable." " 'A marketable title is one that is relatively free from doubt, such that in a suit for specific performance a court would compel the prospective purchaser to accept title.' " *Stewart Title Guar. Co. v. Greenlands Realty, L.L.C.,* 58 F.Supp.2d 360, 365–66 (D.N.J. 1999) (quoting *Keown v. West Jersey Title & Guar. Co.,* 161 N.J.Super. 19, 23, 390 A.2d 715 (N.J.Super.Ct.App.Div.1978)). In other words, a title can be burdened with some defects so minimal or trivial that title is "relatively," although not perfectly, free from doubt. Simply put, some defects do not render title unmarketable, while others do.

■ The circumstances of this case involve a situation in which there was an alleged "defect" that was sufficiently insignificant to leave the title "relatively free from doubt," and, thus, marketable. *See Stewart Title,* 58 F.Supp.2d at 366–69. Therefore, I find, based on the undisputed evidence in the summary judgment record, that Greenlands had marketable title, but that this title also had a "defect." As a result, Stewart Title is obligated, under the title insurance policy issued to Greenlands, to cover the "loss or damage, not exceeding the Amount of Insurance[,] . . . sustained or incurred by [Greenlands] by reason of . . . [this] defect." *See* Alderoty Cert., Ex. E.

Stewart Title contends that it has satisfied any obligations it had under the policy by instituting an action to cure the defect. Section 9 of the title insurance policy provides:

> If the [Stewart Title] establishes the title, or removes the alleged defect, lien or encumbrance, cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

Alderoty Cert., Ex. E. Stewart Title removed the defect by eliminating any possible that claim that a successor-in-interest or legatee of Boardwalk might have to the strip.

Nonetheless, I find that there is a genuine issue of material fact regarding whether or not Stewart Title removed the defect "in a reasonably diligent manner." *See id.* Greenlands presented evidence that Stewart Title knew of the defect in April, 1996, when it issued the commitment for title insurance to Greenlands. *See* Hayes Cert., Ex. 5 (Likens Dep. Tr. at 119). Further, there is evidence in the summary judgment record suggesting that in February, 1997, Stewart Title had concluded that this alleged defect meant that Greenlands did not possess title to the strip. *See id.,*

Ex. 9 (first version of commitment for title insurance issued by Stewart Title to Sun). Despite Stewart Title's awareness of this defect in April, 1996, Stewart Title made no effort to correct the flaw until it filed a quiet title action in the New Jersey Superior Court, Atlantic County, Chancery Division, on August 27, 1997. *See Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.,* 58 F.Supp.2d 360, 364 (D.N.J. 1999); *see also* App., Ex. E (Complaint, accompanying documents, and Judgment in in *Greenlands Realty, L.L.C. v. Boardwalk Realty Co.,* Civil Action No. ATL–C–135–97E, New Jersey Superior Court, Atlantic County, Chancery Division). The delay from February, 1997, until August, 1997, might well have caused Greenlands to suffer termination of its purchase agreement with Sun.

Stewart Title argues that this delay resulted from the terms of the contract, which, Stewart Title contends, only required that the insurer take action under the policy in response to notice from Greenlands, the insured. Section 3 of the title insurance policy provides:

> The insured shall notify [Stewart Title] promptly in writing (i) in case of any litigation as set forth in Section 4(a), (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which [Stewart Title] may be liable by virtue of this policy, or (iii) if title to the estate of interest, as insured, is rejected as unmarketable. If prompt notice shall not be given to the [Stewart Title], then as to the insured all liability of [Stewart Title] shall terminate with regard to the matter or matters for which prompt notice is required; provided, however, that failure to notify the Company shall in no case prejudice the rights of any insured under this policy unless [Stewart Title] shall be prejudiced by the failure and then only to the extent of the prejudice.

*Id.* The plain language of § 3 only requires notice from the insured under three limited circumstances. The notification requirement does not refer to instances in which the insurer, Stewart Title, independently learns of a defect. Moreover, Stewart Title's right to cure the defect "in a reasonably diligent manner," as stated in § 9 of the policy, does not refer to any notice from the insured; that is, the phrase does not read "in a reasonably diligent manner from the time at which notice is received from the insured."

To avoid the obvious import of § 3, Stewart Title argues that "Greenlands was on notice long before [the Title Companies] that ... the marketability of Greenlands'[s] title to the [s]trip was, at best, questionable." Brief in Reply to Opposition of Defendant Greenlands Realty, L.L.C. to the Summary Judgment of Stewart Title Guaranty Co. and The Title Co. of [New] Jersey, Dec. 17, 1998, at 10. There is evidence in the summary judgment record to corroborate this view. First, during his negotiations with Woolworth, Zoll, who was Greenlands's predecessor-in-interest, as well as Woolworth, did not realize that the strip was part of the property. *See* Counterclaim ¶ 11. Additionally, Zoll only obtained a quit claim deed to the strip, suggesting at least the possibility that there might have been a problem with the chain of title. *See* App., Ex. C–7.

On the other hand, Greenlands ardently contends that it had no knowledge of the defect in title to the strip until June 26, 1997, when Sun sent a letter informing Greenlands that "title to the Property does not appear to be marketable or insurable based on the Title Commitment." Alderoty Cert., Ex. C (June 26, 1997, letter); *see also* Counterclaim ¶ 47 ("Mr. Sklar's June 26, 1997 letter, which was sent less than a week prior to the scheduled closing, was the first notice Greenlands received that anyone claimed it lack good and marketable title to the Strip or that Stewart [Title] would not insure title to the Strip unless a confirmatory deed were obtained

from Boardwalk Realty."). In his certification, Zoll states: "I was not aware of any claim that Greenlands lacked marketable title to the Strip portion of the Property until receiving a letter from Arthur Sklar, Esq., dated June 26, 1997." Zoll Cert., ¶ 5. Drawing all reasonable inferences in favor of the non-moving party, *see Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995), I must infer that Greenlands would have likely attempted to cure the defect months before the July 3, 1997, "time of the essence" closing date with Sun, had it known about the defect at an earlier time. Thus, there clearly are various genuine issues of material fact about whether Greenlands knew about the alleged defect earlier and breached its obligation to notify Stewart Title under § 3 of the title insurance policy. Moreover, there is also a genuine issue of material fact regarding whether or not Stewart Title acted with reasonable diligence in curing this defect, under § 9 of the policy. If the trier of fact concludes that Greenlands did not know about the defect until June 26, 1997, as Greenlands alleges, then the trier of fact must determine whether or not Stewart Title's conduct in curing this alleged defect was reasonably diligent.

Because there is a genuine issue of material fact with respect to whether or not Greenlands fulfilled its contractual obligation under § 3 of the title insurance policy and whether or not Stewart Title fulfilled its obligations under § 9 of the title insurance policy, I will deny Stewart Title's motion for summary judgment with respect to Count V of the Counterclaim, which alleges a claim of breach of contract against Stewart Title. For the same reason, I will deny the Title Companies' motion for summary judgment on Count II of the Complaint.

## 2. Count VII of the Counterclaim: Breach of Contract Claim Asserted Against TCJ

Greenlands alleges that TCJ "breached its contract to abstract title to the Property when it failed to identify the title defects and/or errors Stewart [Title] and [TCJ] claimed existed in Greenlands'[s] chain of title to the [s]trip, and/or failed to advise Greenlands of these defects and errors." Counterclaim ¶ 98.

Accompanying the various motions for summary judgment filed by each party in this case have been numerous documents and excerpts of deposition testimony. After reviewing the documents submitted in connection with the Title Companies' motion for summary judgment, as well as those submitted with the motions for summary judgment filed by Greenlands and Sun, I find that there is no evidence in the record of a written or oral contract between Greenlands and TCJ. Evidence that TCJ charged Greenlands for a title search, *see* Hayes Cert., Ex. 15, is an insufficient basis upon which to find that TCJ had entered into a contract or assumed a duty to perform such a title search. *See Walker Rogge, Inc. v. Chelsea Title. & Guar. Co.,* 116 N.J. 517, 562 A.2d 208 (1989). Furthermore, there is no evidence in the summary judgment record of any sort suggesting that there was an implied contract under which TCJ agreed to provide an abstract. *See id.* at 541, 562 A.2d 208 (holding that, in the absence of a contractual arrangement, a title company must engage in conduct by which the court can determine that it voluntarily assumed a duty to search title). I find that Greenlands cannot pursue a claim for breach of contract where it has failed to set forth any evidence demonstrating the existence of a contract. Accordingly, I will grant the Title Companies' motion for summary judgment with respect to Count VII, which alleges a claim of breach of contract asserted against TCJ.

## 3. Count VIII of the Counterclaim: Bad Faith Asserted Against The Title Companies

In Count VIII of its Counterclaim, which asserts a claim of bad faith, Greenlands alleges that:

Stewart [Title] and [the] Title Company abrogated all responsibility for the defects they claimed existed in Greenlands'[s] title, refused to provide any assistance in clearing title in time for Greenlands to close upon the Griffin Agreement even though they had adequate time to do so, and failed to warn Greenlands that they believed it lacked sufficient title to convey the Strip to Griffin/Sun and that Stewart [Title] would not insure title unless a confirmatory deed from Boardwalk were obtained.

Counterclaim ¶ 103. Greenlands further alleges that the "Title Company and Stewart [Title] acted in bad faith in modifying, at Sun's request, the Commitment they issued to insure any title Sun would obtain from Greenlands upon receipt of a deed from Greenlands, and failing to advise Greenlands that they had taken such action." *Id.* ¶ 108.

■■■ "The obligation to perform in good faith exists in every contract, including those contracts that contain express and unambiguous provisions permitting either party to terminate the contract without cause." *Sons of Thunder v. Borden, Inc.,* 148 N.J. 396, 421, 690 A.2d 575 (1997). Further, "[t]he duty of good faith and fair dealing pervades insurance contracts." *Sears Mortgage Corp. v. Rose,* 134 N.J. 326, 347, 634 A.2d 74 (1993). "Good faith is defined as 'honesty in fact in the conduct or transaction concerned.'" *Sons of Thunder,* 148 N.J. at 421, 690 A.2d 575 (quoting N.J. Stat. Ann. § 12A:1–201(19)).

■■■ The implied covenant of good faith and fair dealing imposes duties that exist as part of every contract formed in New Jersey. *See id.* In other words, in the absence of a contract, there can be no claim for bad faith. *See id.* Greenlands was not a party to the commitment for

title insurance [12] issued by Stewart Title to Sun. As a result, Greenlands cannot pursue a claim for bad faith relating to that commitment for title insurance. Similarly, as I found above, in Section III.A.2, Greenlands never had a contract with TCJ and, therefore, Greenlands cannot pursue a claim of bad faith against TCJ.

■■■ By contrast, Greenlands can assert a claim for bad faith against Stewart Title in connection with Stewart Title's conduct surrounding Greenlands's own title insurance policy. For example, I find that there is evidence in the summary judgment record suggesting that the day after Sun sent a letter to Greenlands indicating that Sun believed that title was neither marketable nor insurable, providing Greenlands with a claim under its title insurance policy, Stewart Title attempted to modify, unilaterally, the policy. A reasonable trier of fact could conclude that this conduct, engaged in by Stewart Title, was not "honest in fact." *See Sons of Thunder,* 148 N.J. at 421, 690 A.2d 575. Further, if Stewart Title believed it made an error, which it discovered in February, 1997, a reasonable factfinder might find that Stewart Title's failure to inform Greenlands of this error in February, which would have given Greenlands the opportunity to cure the alleged defect before the July 3, 1997, scheduled closing, was not "honest in fact." *See id.*

Accordingly, I will deny the Title Companies' motion for summary judgment on Count VIII of the Counterclaim, which asserts a claim for bad faith, to the extent that it involves Greenlands's own title insurance policy. I will, however, grant the motion for summary judgment with respect to the part of Count VIII of the Counterclaim that relates to the commitment for title insurance issued by Stewart Title to Arthur Sklar, Esq., on behalf of Sun. Additionally, I will grant the Title

---

**12.** The Court intimates no opinion as to whether or not the commitment for title insurance issued by Stewart Title to Sun constituted an enforceable contract, however, for the purpose of this discussion, I will assume that this commitment for title insurance is a contract.

Companies' motion for summary judgment on Count VIII of the Counterclaim asserted against TCJ.

## B. Tort Claims

### 1. Count IV of the Counterclaim: Breach of Fiduciary Duty Asserted Against Stewart Title

In Count IV of its Counterclaim, Greenlands alleges that "Stewart [Title] assumed a fiduciary duty to protect Greenlands'[s] title to the Property" and Stewart Title breached this duty. Counterclaim ¶¶ 78, 80. In response, the Title Companies argue that "[r]ecovery of tort damages for purely economic losses is precluded where contractual means of recovery exist." Pl.'s Brief at 28 (citing *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 262, 495 A.2d 107 (1985)).

■■■■■■ Under New Jersey law, a "dispute [that] clearly arises out of and relates to [a] contract and its breach" sounds in contract and not in tort. *Wasserstein v. Kovatch*, 261 N.J.Super. 277, 286, 618 A.2d 886 (N.J.Super.Ct.App.Div.1993); *see also Pickett v. Lloyd's*, 131 N.J. 457, 474, 621 A.2d 445 (1993) ("Because we view the cause of action as sounding more in contract than in tort, we believe that the familiar principles of contract law will suffice to measure the damages."). For example, in *New Mea Construction Corp. v. Harper*, William and Helene Harper asserted a claim against the builder of their home, alleging that the builder "negligently supervised the construction of the [home]." *New Mea Constr. Corp. v. Harper*, 203 N.J.Super. 486, 494, 497 A.2d 534 (App.Div.1985). The court found that "there was no personal injury or consequential property damage" and "the loss [was] of a nature more normally associated with a contract action." *Id.* The court concluded: "Given these factors and the understanding that the relationship between the parties is governed by a lengthy and comprehensive contractual arrangement, [the claim for negligence] is more soundly based on contract than on tort."

*Id.* "It has, thus, consistently been held that an independent tort action is not cognizable where there is no duty owed to the plaintiff other than the duty arising out of the contract itself." *International Minerals & Mining Corp. v. Citicorp N. Am., Inc.*, 736 F.Supp. 587, 597 (D.N.J.1990) (applying New Jersey law). As a result, in *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.*, 116 N.J. 517, 562 A.2d 208 (1989), the New Jersey Supreme Court held that "a title company's liability is limited to the policy and ... the company is not liable in tort for negligence," *id.* at 535, 562 A.2d 208, unless the company engaged in conduct by which it voluntarily assumed a duty in addition to those obligations created by the policy. *See id.* at 541, 562 A.2d 208. Thus, unless the insurer engages in affirmative conduct to assume a duty voluntarily on behalf of the insured, the title insurance policy governs the relationship between the insured and the insurer and limits the causes of action which the insured may assert against the insurer. *See id.* at 540, 562 A.2d 208 ("Although we recognize that an insured expects a title company will conduct a reasonable title examination, the relationship is essentially contractual.").

The facts of *Walker Rogge* are instructive. Walker Rogge, Inc. ("Walker Rogge"), purchased a piece of property "on the basis of $16,000.00 per acre." *Id.* at 521, 562 A.2d 208. "The contract indicated the quantity of land to be 1[8] acres more or less," and, thus, "called for a price of $363,000." *Id.* After paying the $363,000, Walker Rogge realized that the property contained 5.5 fewer acres than stated in the contract, suggesting that, based on the $16,000 per acre price, Walker Rogge had paid $88,000 in exchange for absolutely nothing. *See id.* at 527, 562 A.2d 208. Walker Rogge then asserted a claim against its title insurer, Chelsea Title and Guaranty Co. ("Chelsea"), claiming "that Chelsea was liable in negligence [for] failing to disclose documents in its files revealing that the property contained fewer

than eighteen acres." *Id.* at 526, 562 A.2d 208. "In support of that claim, [Walker Rogge relied upon] Chelsea's separate charge for [a] 'title examination' and its reliance on Chelsea to conduct a reasonable search." *Id.* at 535, 562 A.2d 208.

In considering this claim, the New Jersey Supreme Court recognized that "lower courts ... have divided on the question whether a title company should be exposed to liability in tort for negligence in searching records as well as to liability in contract under its policy of insurance." *Id.* The New Jersey Supreme Court noted that "[i]n this state, the rule has been that a title company's liability is limited to the policy and that the company is not liable in tort for negligence in searching records ... If, however, the title company agrees to conduct a search and provide the insured with an abstract of title in addition to the title policy, it may expose itself to liability for negligence as a title searcher in addition to its liability under the policy." *Id.* (citations omitted). "Notwithstanding Chelsea's separate $75 charge for [a] 'title examination,'" the trial court found, and the New Jersey Supreme Court affirmed, that Chelsea had not made any agreements or taken any actions by which it "agree[d] to conduct a [title] search." *Id.* at 536, 562 A.2d 208. "Even though [Walker Rogge] was billed for [a] title search," the trial court concluded that this "title search which was completed by Chelsea was simply an internal procedure for Chelsea's own purposes in deciding whether or not to issue a title policy." *Id.* The New Jersey Supreme concluded that, because there was no evidence in the record that Chelsea had made any statements or engaged in any conduct by which it could be held to have agreed to obligations other than those stated in the title insurance policy, Chelsea's liability was limited to the title insurance policy to any contract claims that could be asserted by Walker Rogge.

■ Like *Walker Rogge*, Greenlands's tort claim for breach of fiduciary duty

arises out of its title insurance policy. *See* Counterclaim ¶ 78 ("In issuing the Title Policy to Greenlands, Stewart [Title] assumed a fiduciary duty to protect Greenlands' title to the Property."). Thus, Greenlands's claim against Stewart Title for breach of fiduciary duty sounds in contract, rather than in tort. Further, there is no evidence contained in the summary judgment record to suggest that Stewart Title assumed any obligations or duties on behalf of Greenlands other than those explicitly stated in the title insurance policy. *See Walker Rogge*, 116 N.J. at 541–42, 562 A.2d 208. Accordingly, I will grant the motion for summary judgment on Count IV of the Counterclaim, which asserts a claim of breach of fiduciary duty against Stewart Title.

Moreover, Greenlands cannot assert any tort claims against the Title Companies arising out of its title insurance policy, because any such claims sound in contract, rather than in tort and are precluded under the New Jersey Supreme Court's holding in *Walker Rogge*. Nonetheless, this does not preclude Greenlands from asserting claims against either Stewart Title or TCJ that arise out of the actions of either of those two parties relating to the issuance of a commitment for title insurance to Sklar on behalf of Sun, or to the determination of possession of title in order to issue such a commitment.

### 2. Count III of the Counterclaim: Slander of Title Asserted Against The Title Companies

In Count III of its Counterclaim, Greenlands alleges that "[the Title Companies] slandered and libeled Greenlands'[s] title when they advised Griffin/Sun that title to the [s]trip was vested in Boardwalk Realty and the Greenlands lacked good and marketable title, and when they refused to insure title to the [s]trip." Counterclaim ¶ 74. This allegation relates only to the Title Companies' issuance of a commitment for title insurance to Sklar, and, therefore, is not covered by any contractual remedies that Greenlands may have.

"[T]he tort of slander of title requires a plaintiff to establish that defendant falsely published an assertion concerning plaintiff's title which caused special damages to the plaintiff and that defendant acted out of malice, which was express or implied." *Lone v. Brown,* 199 N.J.Super. 420, 426, 489 A.2d 1192 (1985); *cf. Lithuanian Commerce Corp. v. Sara Lee,* 47 F.Supp.2d 523, 537 (D.N.J.1999) (Orlofsky, J.) (holding that the elements of trade libel, which has the same elements as slander of title, are: "1) publication 2) with malice 3) of false allegations concerning its property, product or business, and 4) special damages, i.e., pecuniary harm") (quoting *Juliano v. ITT Corp.,* Civ. No. 90–1575, 1991 WL 10023, *4 (D.N.J. Jan.22, 1991) (Fisher, J.) (citing *System Operations v. Scientific Games Dev. Corp.,* 555 F.2d 1131, 1140 (3d Cir.1977))). "Malice is defined as the intentional commission of a wrongful act without just cause or excuse." *Lone,* 199 N.J.Super. at 426, 489 A.2d 1192.

In the summary judgment record, there is evidence that the Title Companies informed Sklar that Greenlands held unmarketable, or no, title to the strip. Sklar's letter of June 26, 1997, to Greenlands stated: "[T]itle to the Property does not appear to be marketable or insurable *based on the Title Commitment.*" Alderoty Cert., Ex. C (emphasis added). Further, Likens testified that he believed that Greenlands possessed title, but that Stewart Title altered the commitment for title insurance only at the request of Sklar. *Id.,* Ex. 5 (Likens Dep. Tr. at 91). Similarly, Gillingham testified, in his deposition, that at no time did he believe that the defect was more than a scrivener's error. App., Ex. N (Gillingham Dep. Tr. at 60). Thus, there is evidence that when Gillingham wrote the June 27, 1997, stating that Greenlands did not have title to the strip, he himself believed his statement to be false. Furthermore, Gillingham also testified in his deposition that he made any changes to the commitment for

title insurance that Sklar requested. *See* Hayes Cert., Ex. 11 (Gillingham Dep. at 112). Therefore, there is evidence of a "wrongful act." *See Lone,* 199 N.J.Super. at 426, 489 A.2d 1192. Finally, it is undisputed that Greenlands suffered a pecuniary loss as a result of Sun's termination of the purchase agreement. In sum, there is evidence in the summary judgment record from which the trier of fact could reasonably conclude that Stewart Title altered the title commitment, even though it believed that Greenlands possessed title, to satisfy Sun. Further, a reasonable factfinder could conclude that such conduct constitutes "a wrongful act without just cause or excuse." *Id.* Based on this evidence and the inferences that may reasonably be drawn therefrom, there is a genuine issue of material fact with respect to Greenlands's claim of slander of title that precludes me from granting summary judgment. Accordingly, I will deny the Title Companies' motion for summary judgment on Count III of the Counterclaim, which asserts a claim of slander of title.

### 3. Count VI of the Counterclaim: Negligent Title Search Asserted Against TCJ

As I concluded above, there is no evidence in the summary judgment record that there was a contract between TCJ and Greenlands. As a result, Greenlands's claim for negligent title search, asserted against TCJ, cannot possibly be barred by contractual remedies or under *Walker Rogge.* The more pertinent issue, however, is whether TCJ had any obligation to perform a title search, given my finding that there was no contract obligating it to do so.

In *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.,* 116 N.J. 517, 541, 562 A.2d 208 (1989), the New Jersey Supreme Court held a that title company could voluntarily assume duties beyond those created by a contract if: (1) the company "knew or should have known" that an insured expected the title company to perform a

service; (2) the insured relied upon that expectation; and (3) and the company knew that the service would provide information material to a transaction. In this case, the set of deeds, representing the chain of title from Boardwalk through Greenlands, was attached to the commitment for title insurance. *See* Hayes Cert., Ex. 3. Arguably, by attaching the fruits of its title search, TCJ may have assumed a duty to provide Greenlands with an accurate set of deeds.

I need not determine whether or not TCJ did assume such a duty, however, because TCJ did provide a complete and accurate set of deeds, documenting the chain of title from Boardwalk through Greenlands. Greenlands does not claim, and the evidence does not suggest, that TCJ failed to find or to include a deed contained in the chain of title. Rather, Greenlands contends that TCJ made an inaccurate interpretation of the results of that title search. That is, Greenlands alleges that TCJ "carelessly and recklessly failed to identify the title defects and/or errors [that] Stewart [Title] and [TCJ] subsequently claimed existed in Greenlands'[s] chain of title to the [s]trip." Counterclaim ¶ 94. Even if TCJ did fail to identify the alleged defect, there is no evidence in the summary judgment record suggesting that TCJ had any obligation to interpret the chain of title for Greenlands. To be clear, there is no evidence that TCJ assumed a duty to abstract title or perform a complete title search, which would have obligated TCJ to provide Greenlands with a determination of "whether title to the property [was] good." [13] *See Black's Law Dictionary* 1487 (6th ed.1990) (definition of "title search"); *see also id.* at 10 (defining an "abstract of title" as a "[m]emorandum or concise statement in orderly form of the substance of documents or facts appearing on public records which affect title to real property"). Thus,

to the extent that TCJ may have assumed a duty to provide Greenlands with a set of deeds, it did so accurately and completely. Accordingly, I will grant the Title Companies' motion for summary judgment on Count VI of the Counterclaim, which asserts a claim of negligent title search.

### 4. Count IX of the Counterclaim: Negligent Misrepresentation Asserted Against The Title Companies

 Greenlands alleges, in Count IX of its Counterclaim, that "[i]n the Title Policy, [TCJ] and Stewart [Title] represented to Greenlands that it had good and marketable title in fee simple to the [entire] Property without defect or objection." Counterclaim ¶ 114. Greenlands further alleges that the "[TCJ] and Stewart [Title] knew or should have known that Greenlands would rely upon th[is] representation[ ]." *Id.* ¶ 116. Essentially, Greenlands seeks to hold the Title Companies liable for an allegedly negligent title abstract reflected in Greenlands's title insurance policy.

Through this claim, Greenlands is attempting to pursue a tort remedy on a contractual claim. "[A] title company's liability is limited to the policy and that company is not liable in tort for negligence in searching records." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 535, 562 A.2d 208 (1989). "Underlying that rule is the premise that the duty of the title company, unlike the duty of a title searcher, does not depend on negligence, but on the agreement between the parties." *Id.* As the New Jersey Supreme Court explained in *Walker Rogge*:

> Although we recognize that an insured expects that a title company will conduct a reasonable title examination, the relationship between the company and the insured is essentially contractual. . . . The end result of the relationship be-

---

**13.** Greenlands, in its claim of negligent title search, states that TCJ was negligent "[i]n abstracting title for Greenlands." Counterclaim ¶ 94. There is no evidence in the sum- mary judgment record, however, that TCJ had a contractual obligation or an assumed duty to provide an abstract.

tween the title company and the insured is the issuance of the policy.... From this perspective, the insured expects that in consideration for payment of the premium, it will receive a policy of insurance. The insurer's expectation is that in exchange for that premium it will insure against certain risks subject to the terms of the policy. If the title company fails to conduct a reasonable title examination, or having conducted such an examination, fails to disclose the results to the insured, then it runs the risk of liability under the policy.

*Id.* at 540, 562 A.2d 208 (citation omitted). Thus, Greenlands cannot pursue its claim for negligent misrepresentation, because *Walker Rogge* prohibits an insured from asserting a tort claim based upon a title insurance policy. Furthermore, Greenlands cannot assert a claim for negligence against TCJ, because, as I have found above, in Section III.B.2, TCJ did not have a duty to perform a title search for Greenlands. Accordingly, I will grant the Title Companies' motion for summary judgment on Count IX of the Counterclaim, which asserts a claim of negligent misrepresentation.

### 5. Count X of the Counterclaim: Unfair Trade Practices Asserted Against The Title Companies

 Greenlands alleges that the conduct of the Title Companies relating to 1315 Boardwalk "constitutes unconscionable commercial practices, deception, fraud, false pretenses, false promise, misrepresentation or the knowing concealment, suppression or omission of material facts, with the intent of inducing reliance by Greenlands, in connection with the sale of merchandise or real estate, in violation of N.J. [Stat. Ann. § ] 56:8–2." Counterclaim ¶ 122. The New Jersey Unfair Trade Practices Act ("NJUTPA"), N.J. Stat. Ann. § 56:8–2, also known as the Consumer Fraud Act, provides:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; provided, however, that nothing herein contained shall apply to the owner or publisher of newspapers, magazines, publications or printed matter wherein such advertisement appears, or to the owner or operator of a radio or television station which disseminates such advertisement when the owner, publisher, or operator has no knowledge of the intent, design or purpose of the advertiser.

The NJUTPA covers insurance policies. *See Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 265, 696 A.2d 546 (1997) ("[O]ur reading of the [NJUTPA] convinces us that the statute's language is ample enough to encompass the sale of insurance policies as goods and services that are marketed to consumers.").

The Title Companies have not made any arguments with respect to Greenlands's claim under the NJUTPA. Further, there is evidence in the summary judgment record suggesting that both the Title Companies knowingly concealed the fact that they believed that Greenlands did not possess title to the strip. *See* Sections II and III.A.3 *supra.*

The Title Companies, however, argue that they did not have an obligation to inform Greenlands of the defect. *See* Pl.'s Brief at 26–27. Indeed, they contend that "[s]uch a requirement would place an impossible burden on the title company, and even if it could be effected, it would involve additional costs, which would be reflected in higher title insurance premiums." *Id.*

at 27. This may well be true, however, Stewart Title did not hesitate, on June 27, 1997, to inform Greenlands that it "made a mistake when [it] issued the ... policy insuring" 1315 Boardwalk, because the "strip is owned by Boardwalk Realty Company by deed record in the 1920's [sic]." In other words, once there was a possibility that Stewart Title might be required to provide coverage under the title insurance policy issued to Greenlands, Stewart Title immediately informed Greenlands that there was a defect in its title to 1315 Boardwalk. If Stewart Title did believe that it had erred in issuing the policy, then it is for the trier of fact to decide whether Stewart Title's failure to inform Greenlands of this alleged error until days before the scheduled closing date violated the NJUTPA. Further, Gillingham testified that he believed that the defect was merely a scrivener's error, but then he claimed that Greenlands did not have title to the strip. *See* App., Ex. N (Gillingham Dep. Tr. at 60); *see also* Alderoty Cert., Ex. G (Verifying Affidavit of William P. Gillingham in Support of Plaintiff's Complaint, dated Aug. 21, 1997, ¶ 4, filed in *Greenlands Realty, L.L.C. v. Boardwalk Realty Co.*, Civil Action No. ATL–C–135–97E, New Jersey Superior Court, Atlantic County, Chancery Division) ("I can unequivocally state that as a result of my examination, review and communications, to the best of my knowledge, .... it was as a result of inadvertence or mistake that Boardwalk failed to specifically describe the [strip] when it conveyed title to the Property to Colsey in 1970."). It is for the trier of fact to determine whether these two statements demonstrate that Gillingham misrepresented Greenlands's title to the strip. Accordingly, I will deny the Title Companies' motion for summary judgment on Count X of the Counterclaim, which alleges a violation of NJUTPA.

## IV. CONCLUSION

For the reasons set above, I find that there are genuine issues of material fact

with respect to: (1) Count II of the Complaint, which seeks a declaratory judgment finding that Stewart Title has fulfilled its obligations under the title insurance policy issued to Greenlands; (2) Count III of the Counterclaim, asserting a claim for slander of title against the Title Companies; (3) Count V of the Counterclaim, asserting a claim of breach of contract against Stewart Title; and (4) Count X of the Counterclaim, asserting a claim under the New Jersey Unfair Trade Practices Act, N.J. Stat. Ann. § 56:8–2,[14] against the Title Companies. Therefore, I will deny the Title Companies' motion for summary judgment on Counts III, V, and X of the Counterclaim. Additionally, I find that there is a genuine issue of material fact with respect to the part of Count VIII of the Counterclaim, which alleges a claim of bad faith, that relates to Stewart Title's conduct in connection with the title insurance policy that it issued to Greenlands. By contrast, I hold that Greenlands may only assert a claim for bad faith in connection with a contractual relationship. Because I have found that there is absolutely no evidence in the summary judgment record that Greenlands had a contractual relationship with TCJ, I will grant the Title Companies' motion for summary judgment on Count VIII of the Counterclaim asserted against TCJ. Further, I will also grant the Title Companies' motion for summary judgment with respect to Greenlands's allegations, asserted as part of Count VIII of the Counterclaim, that Stewart Title acted in bad faith while negotiating a commitment for title insurance for Sun.

Moreover, I will grant the Title Companies' motion for summary judgment on: (1) Count IV of the Counterclaim, which alleges a claim of breach of fiduciary duty against Stewart Title, because, under the New Jersey Supreme Court's holding in *Walker Rogge*, the availability of contractual remedies to Greenlands prohibit it from pursuing tort remedies; (2) Count VI

14. *See* Section III.B.4 for the complete text of the statute.

of the Counterclaim, which alleges a claim of negligent title search against TCJ, because there is no evidence in the summary judgment record that TCJ voluntarily assumed the duty to conduct a title search; (3) Count VII of the Counterclaim, which asserts a breach of contract claim against TCJ, since there is no evidence in the summary judgment record that Greenlands and TCJ entered into a contract; and, (4) Count IX of the Counterclaim, which asserts a claim of negligent misrepresentation against the Title Companies, because, under *Walker Rogge*, Greenlands cannot pursue tort remedies where it has a remedy available in contract.

## ORDER

This matter having come before the Court on the motion of Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company and Additional Counterclaim Defendant, Title Company of New Jersey, for summary judgment on the Counterclaims of Defendant, Greenlands Realty, L.L.C., Linda J. Cohen, Esq., and Robert W. Hayes, Esq., of Cozen and O'Connor, appearing on behalf of Defendant, Greenlands Realty, L.L.C., Philip B. Seaton, Esq., and Gregory A. Lomax, Esq., of Kozlov, Seaton, Romanini, Brooks & Greenberg, appearing on behalf of Additional Counterclaim Defendant, Sun International of North America, Inc., and Stuart Alderoty, Esq., and David P. Kalm, Esq., of Leboeuf, Lamb, Greene & Macrae, L.L.P., appearing on behalf of Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company and Additional Counterclaim Defendant, Title Company of New Jersey (collectively, the "Title Companies"); and,

The Court having considered the submissions of the parties, and for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 20th day of July, 1999, HEREBY ORDERED that the motion of Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company and Additional Counterclaim Defendant, Title Company of New Jersey, for summary judgment on the Counterclaims of Defendant, Greenlands Realty, L.L.C., is GRANTED in part and DENIED in part, specifically:

1. The Title Companies' motion for summary judgment is DENIED on Count II of the Complaint of Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company, and on Counts III, V, and X of the Counterclaim of Defendant, Greenlands Realty, L.L.C.;

2. The Title Companies' motion for summary judgment is GRANTED on Counts IV, VI, VII, and IX of the Counterclaim of Defendant, Greenlands Realty, L.L.C.;

3. The Title Companies' motion for summary judgment is GRANTED on Count VIII of the Counterclaim of Defendant, Greenlands Realty, L.L.C., as asserted against Additional Counterclaim Defendant, Title Company of New Jersey, and with respect to all allegations relating to a commitment for title insurance issued to Arthur Sklar, Esq., on behalf of Additional Counterclaim Defendant, Sun International of North America, Inc., however, the Title Companies' motion for summary judgment on Count VIII of the Counterclaim is DENIED with respect to allegations relating to the conduct of Plaintiff and Additional Counterclaim Defendant, Stewart Title Guaranty Company, in connection with the title insurance policy it issued to Defendant, Greenlands Realty, L.L.C.